LELAND D. PAYNE AND ZELMA PAYNE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 54441, 54554, 54704.   Filed August 14, 1958.

---

[1] The following proceedings are consolidated herewith: J. T. Jenkins and Myrtle Jenkins, Docket No. 54554; and R. B. Walden and Marcelle Walden, Docket No. 54704.

*Wm. H. Evans, Esq.*, for the petitioners.
*Carswell H. Cobb, Esq.*, for the respondent.

FORRESTER, *Judge:* In these consolidated proceedings the Commissioner determined deficiencies in income tax and additions to tax for the year 1950 as follows:

|  | | Additions to tax | |
| Petitioners | Deficiency | Sec. 294 (d) (1) (A) | Sec. 294 (d) (2) |
| --- | --- | --- | --- |
| L. D. and Zelma Payne | $42, 476. 35 | | |
| J. T. and Myrtle Jenkins | 54, 349. 40 | $4, 891. 43 | $3, 260. 97 |
| R. B. and Marcelle Walden | 3, 432. 32 | 563. 56 | |

The principal issue for decision is whether the gain realized by the respective petitioners on the redemption of their second preferred common stock in eight separate housing corporations is taxable to them as gain from the sale or exchange of capital assets, as gain from distributions by collapsible corporations under section 117 (m), I. R. C. 1939, or as compensation for personal services and for the supplying of building materials at cost under section 22 (a), I. R. C. 1939. Also in issue are additions to tax for failure to file a declaration of estimated tax in respect of petitioners J. T. and Myrtle Jenkins and R. B. and Marcelle Walden. Petitioners J. T. and Myrtle Jenkins have conceded an issue of additions to tax for substantial underestimation of tax.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioners Leland D. Payne and Zelma Payne, husband and wife, petitioners J. T. Jenkins and Myrtle Jenkins, husband and wife, and petitioners R. B. Walden and Marcelle Walden, husband and wife, filed their respective joint income tax returns with the collector of internal revenue at Dallas, Texas. The wives are involved solely by reason of having made joint returns with their husbands.

In 1949 the Federal Housing Administration (hereinafter referred to as the F. H. A.) was in the midst of a general nationwide program of sponsoring the creation of rental-housing facilities. Under section 608 of the National Housing Act it was seeking to promote the construction of rental-housing projects through liberal Government financing. The F. H. A. program permitted the issuance of mortgage loan insurance commitments in an amount equal to 90 per cent of the total value of any approved project. Its appraisals were based upon the current replacement cost of improvements and the fair market price of land, irrespective of cost.

Petitioners Leland D. Payne (hereinafter referred to as Payne), J. T. Jenkins (hereinafter referred to as Jenkins), and R. B. Walden (hereinafter referred to as Walden), were all familiar with the F. H. A. program as above. Payne and Jenkins were in close contact with the F. H. A., its officers, its policies, and its detailed procedures. The F. H. A. knew both Payne and Jenkins favorably.

The background of the three petitioners is as follows: Payne had been an employee of the Lubbock National Bank of Lubbock, Texas, in the years immediately following World War II. His official title while so employed was vice president in charge of mortgage loan banking. In this capacity he supervised the bank's various accounts with contractors, builders, and material supply companies. He also supervised the bank's accounts with insurance companies and trust companies in relation to their purchase of mortgages. In 1948 he purchased a retail lumber company after leaving the employment of the Lubbock National Bank.

Jenkins was a building contractor and an investor in real estate properties. He had engaged in these businesses for many years and, as mentioned above, was in close contact with the F. H. A., its officers and its policies.

Walden was engaged in the building industry in various capacities, including that of building contractor, and was familiar with the F. H. A. building organization and its mortgage loan policies.

In 1949, petitioners Payne and Jenkins joined in a plan to promote six contemporaneous F. H. A. section 608 rental-housing projects in Lubbock, Texas. Their plan envisioned six separate corporations to

construct and operate the individual projects. While the contemplated projects were to be located in one area the use of multiple corporations was chosen in order to facilitate financing. The capitalization of each corporation was to include retireable stock. By the issuance and subsequent retirement of such stock it was hoped that they would be able to recoup a substantial portion of their investment in land.

In July 1949, Payne and Jenkins contracted to purchase 28.44 acres of land located outside the city limits of Lubbock, Texas, but adjacent thereto. The contract price was $73,800, one-third of which price was incurred by Payne and two-thirds by Jenkins. The purchase was completed prior to October 31, 1949, and payment was made by Payne and Jenkins.

Payne and Jenkins employed draftsmen and counsel and caused the land to be platted into 125 lots. On September 7, 1949, they filed application with the City of Lubbock for incorporation of the land within the city limits and for official acceptance of the property as city lots. The land was accepted by the city and the plat was approved on October 20, 1949.

Pursuant to the provisions of said section 608, the F. H. A., on October 26, 1949, agreed to insure, upon completion, loans totaling $1,475,200 for the construction of the six rental-housing projects Payne and Jenkins proposed to build. The F. H. A.'s project analysis estimated that the total replacement cost of the six projects would be $1,699,443, of which $105,424 was shown as representing the fair market price of the land.

On October 31, 1949, Payne and Jenkins organized six Texas corporations identically titled except for the identifying initial: "Highland Place Development Company of Lubbock A,[2] Inc." Payne, Jenkins, and Neal Duke were listed as incorporators of each of the six corporations. Neal Duke held his stock for Payne as beneficial owner and was an incorporator solely for the purpose of qualifying the respective corporations under Texas law.

The capital structure of each of the above corporations consisted of 90 shares of common stock, 100 shares of preferred stock, and 240 shares of second preferred common stock. The par value of the common stock was $10 per share, the par value of the preferred stock was $1 per share, and the par value of the second preferred common stock was $100 per share.

Under the certificate of incorporation, the second preferred common stock could be retired at the end of any semiannual fiscal period out of any funds representing earned or donated surplus or other excess cash funds, except the proceeds of secondary financing, after making

---

[2] The other five corporations were identified "B," "C," "D," "E," and "F."

provision for payment of operating expenses, the establishment of a reserve fund for replacements, and payment of all currently outstanding interest and principal. However, no such stock could be retired until after the completion of the improvements on the property or before the final endorsement for mortgage insurance by the Federal Housing Commissioner. In order to qualify for F. H. A. mortgage insurance it was required that each corporation issue $100 of preferred stock to the F. H. A.

The six Highland Place corporations were capitalized and chartered on October 31, 1949, by the contribution of 123 of the 125 platted lots mentioned earlier. Corporations B, C, and D each received 20 lots and corporations A, E, and F each received 21 lots. In return Payne and Jenkins received, in the proportion of one-third to Payne and two-thirds to Jenkins, all of the common stock and all of the second preferred common stock of each corporation. The lots were free of liens on the date of contribution and it is stipulated that Payne obtained a basis of $23,521.60 for his total second preferred common stockholdings and that Jenkins obtained a basis of $47,043.20 for his total second preferred common stockholdings. The second preferred common stock of the six corporations had a total par value of $144,000 on October 31, 1949.

It was determined that substantial savings could be achieved by treating the six projects as one; consequently, the six Highland Place corporations and Jenkins and Payne, individually, entered into a contract on November 1, 1949, setting forth the terms and conditions of their agreement to consolidate operations. The body of the contract appears below:

*WITNESSETH:*

As sponsors and principal stockholders of the six above named corporations, the undersigned, Leland Payne and J. T. Jenkins have prosecuted F. H. A. loan applications for the building of six housing development units in Highland Place Addition. They have put in the land which they have contracted to buy and are buying from Frank Bernett as the basic capital structure of the six corporations, and they have divided the project into the six corporations because of the necessity to do the same for temporary financing and for loan applications. The Federal Housing Administration replacement cost, that is building cost estimate, and their own building cost estimate, indicates that they will likely be able to pay every expense, cost and charge incident to the final completion of the structures from the proceeds of the loan funds, or nearly so in any event, on the basis that they are willing to undertake the same; that is, with J. T. Jenkins prosecuting all of the building as General Superintendent without any salary or payments to him of any kind for handling these matters for the corporations, and with the Leland Payne Lumber Company furnishing all of the materials at their invoice price. In order to insure the completion of the structures within the funds available, the parties have agreed to such arrangement and such program is part of this agreement.

It was further agreed, and is here written in the agreement, between Jenkins and Payne on the one hand and each of the six corporations on the other hand,

that the financial standing and credit of each of the six corporations will be used in the prosecution of the work until its completion for all six corporations; that as individual loans might be completed and closed during the progress of the entire work, the loan proceeds will be placed into the general building funds in order to be used during the progress of the work. Each of the corporations receives a benefit from this procedure, in that, by progressing the entire work as one unit each of the six corporations will profit in the amount that the final cost of their individual construction will be. The parties contemplate substantial saving in running the projects as one project, and the number of items of expense are difficult of segregation, such as paving of streets and alleys and connection to the city water and sewer systems.

It is agreed, therefore, that no interest rate will be charged for use of the various corporations' monies that may be received by them from loan proceeds. It is further agreed that when the final loan is closed on the last corporation that each corporation will owe prorate, according to the number of dwelling units in the corporation, such amount of deficit as there may be, and likewise each corporation will be entitled to reimbursement from Jenkins and Payne, prorate, on the basis of the number of units in each corporation, the amount of excess funds that there may happen to be on hand from loan proceeds. The corporations' funds as a result of corporation borrowing, or the result of payment of loan proceeds into the corporations, shall be used to pay off any land obligation, but the land obligation is understood and agreed to be the separate and several debt obligation of Jenkins and Pyane [sic], in that, such land has gone into the corporations as its corporate structure. At the final settlement Jenkins and Payne agree to reimburse the corporations for such items of funds that may have been used by them in their general building program which are expenses of Jenkins and Payne and not of the corporations, such as the land purchases.

It is further contemplated that some of the units will be finished much sooner than others, and that during the course of the progress of the rest of the work there will be minor items of maintenance, both of the buildings and of the yeards [sic] and of the streets, in connection with the already completed units. It will be difficult to segregate such minor items of maintenance as may be supplied by the general building program and the workmen on hand for such purpose. Accordingly it is agreed that no particular effort be made to segregate such items but that all of such expenses be carried along as a part of the general project. All expenses in connection with the loan application, F. H. A. fees, title insurance and closing fees will likewise be paid out of the general funds obtained on corporate and individual borrowing. In this connection Jenkins and Payne do agree to use their individual credit in supplying the funds for the building of the structures, as well as each of the corporations agree[s] to the supplying of their credit at the bank for temporary financing.

This memorandum is made and entered by each of the individuals and by all six of the corporations for the purpose of binding each and all of the parties herein mentioned, this first day of November, 1949.

The F. H. A. commitments show that in order for the six Highland Place corporations to secure F. H. A.-insured mortgage loans it was necessary for these corporations to provide for the installation of adequate sewer and water facilities. This was accomplished by contractual arrangements resulting in an ultimate, net obligation of the City of Lubbock to the six corporations in the amount of $43,938. The record is unclear as to the amount of the net cost to the six corpora-

tions of said sewer and water facilities, but it is stipulated that this cost was included in the cost of construction of the project.

The six Highland Place corporations, with the guaranty of Payne and Jenkins and upon their individual credit and with the commitment of the F. H. A., financed all of the costs of construction with temporary financing. Upon completion of each corporation's building project, F. H. A. permanent insured mortgage loans were made by the Lubbock National Bank. Final closing of the various loans took place on the following dates:

Highland Place Development Company of Lubbock A, Inc_____ Apr. 18, 1950
Highland Place Development Company of Lubbock B, Inc_____ Apr. 18, 1950
Highland Place Development Company of Lubbock C, Inc_____ July 7, 1950
Highland Place Development Company of Lubbock D, Inc_____ July 7, 1950
Highland Place Development Company of Lubbock E, Inc_____ June 2, 1950
Highland Place Development Company of Lubbock F, Inc_____ Mar. 2, 1950

The total loan proceeds exceeded the cost of construction, fees, and finance and organization charges by $134,131.35.

On July 15, 1950, the board of directors of each of the six Highland Place corporations met and, among other things, authorized the redemption of the outstanding second preferred common stock. The redemption price was left blank pending a final accounting and winding-up of accounting data, but it was provided that all of the second preferred common stock should be redeemed and that the redemption price should be the total excess cash funds after provision had been made for payment of all due or accrued operating expenses, taxes, assessments, fixed charges, all interest and principal payments, insurance premiums, etc., all in accordance with the corporate charters.

At the meeting it was stated that Payne and Jenkins in their individual capacities had made offers to the respective corporations to purchase certain equipment, certain paving liens, and the obligation of the City of Lubbock arising out of the contractual arrangement for water and sewer lines described above. It was further stated that the above equipment and liens had been acquired by expenditures out of the general building funds, and, as noted above, it has been stipulated that the corporations' cost for the above water and sewer lines was included in the cost of construction of these six rental-housing projects. The offers were accepted by the directors of each of the corporations.

It was further provided in the minutes of the meetings of the board of directors of each of the Highland Place corporations that a monthly salary of $600 should be paid to Jenkins and $300 to Payne, beginning August 1, 1950, and for the remainder of 1950. It was stated that this salary would in a measure compensate these corporate officers for work previously done.

On July 31, 1950, the six Highland Place corporations made payments to Jenkins totaling $24,431.07 and to Payne totaling $12,206.54. Thereafter, on September 11, 1950, the corporations completed the redemption of the second preferred common stock by making payments of $94,282.20 to Jenkins and $47,150.09 to Payne. (Total redemption payments were $118,713.27 to Jenkins and $59,356.63 to Payne for a combined total of $178,069.90.) Prior to or at the time of the redemption of the second preferred common stock, Payne and Jenkins gave their checks totaling $69,637.60 to the Highland Place corporations in payment for the aforementioned equipment and the City of Lubbock water and sewer obligations. The record does not indicate any disposition of the paving obligations.

Each of the Highland Place corporations reports its income on the basis of a fiscal year ending July 31. As of July 31, 1950, there was a total of $16,065.06 earnings and profits from rental operations after incorporation. Losses of the six corporations for the fiscal year ended July 31, 1951, totaled $36,959.72. At the date of the stock redemption, Payne and Jenkins had owned their stock in each of the six Highland Place corporations for more than 6 months.

From the date of incorporation until sometime in 1951 Jenkins was president and Payne was secretary of each of the six corporations. Payne now owns all of the stock of the six corporations, draws salaries from them totaling about $24,000 per annum, and his investment has growth potential. On July 31, 1950, the directors of the six corporations were Payne, Jenkins, and Neal Duke.

As a separate business operation, petitioners Payne and R. B. Walden and a third man, Pat Hudson, joined together in promoting an F. H. A. rental-housing project in Big Spring, Texas, after learning that that city needed additional rental-dwelling units. On January 12, 1950, Payne, Walden, and Hudson, as buyers in the ratio of 45 per cent, 35 per cent, and 20 per cent, entered into a contract to purchase a portion of an unplatted tract of land located inside the city of Big Spring, Texas, and known as the old "Rodeo Grounds." In addition to paying the amount of $24,000 for the land, the buyers agreed among themselves to plat the land, to undertake, pay for, and cause the City of Big Spring to zone the property appropriately for duplex-housing constructions and to cause the acceptance of a new plat known as the Bellvue Addition.

In order for Payne, Walden, and Hudson to accomplish their undertaking it was necessary for them to finance adjoining paving liens of third-party property owners, by guaranteeing purchase of such liens from the City of Big Spring. The buyers satisfied the conditions of their contract and paid for the land in the agreed-upon proportions out of their individual funds.

The land was divided by Payne, Walden, and Hudson into 40 city lots. These lots were then conveyed, on May 15, 1950, to two corporations, Big Spring Rental Houses A, Inc., and Big Spring Rental Houses B, Inc., 20 lots to each corporation. These corporations had been formed that same day for the purpose of receiving the land and constructing the rental dwellings. In return for the conveyance of land the three incorporators, Payne, Walden, and Hudson, received the common stock and the second preferred stock of both corporations in the proportion of their respective interests in the land.

The corporate charter of each Big Spring corporation authorized the issuance of $29,000 in second preferred common stock. In all other respects the corporate charters were similar to those of the Highland Place corporations. Payne's basis for his second preferred common stock was $10,387.63 and Walden's basis was $8,079.05. Their bases for this stock were determined by prorating the cost of the land transferred to the two corporations over the two classes of stocks received in exchange. It is stipulated that the land had a fair market value equal to or exceeding $33,000 on May 15, 1950, the date of incorporation of the two Big Spring corporations.

F. H. A. loan applications were prosecuted and commitments were received from the F. H. A. to insure mortgage loans in the amount of $478,200. The F. H. A. project analysis estimated the replacement costs of the project at $536,249, of which $33,000 was shown as representing the fair market price of the land.

The two corporations, with the guaranty of Payne, Walden, and Hudson, and upon their individual credit and with the commitment of the F. H. A., financed all of the costs of construction with temporary financing. On September 15, 1950, permanent F. H. A.-insured mortgage loans were made to Big Spring Rental Houses A, Inc., and Big Spring Rental Houses B, Inc., by the Lubbock National Bank. The loan proceeds exceeded the costs of construction, fees, and finance and organization charges by $28,193.98.

It is stipulated that:

These parties knew in advance that F. H. A. would likely issue a loan commitment for an amount equal to 90% of the total value of the project. They knew the appraisals of F. H. A. were based upon replacement cost of improvements, together with an appraisal of the actual value of the land regardless of its cost to the individuals. By building the two projects as one unit, by buying in bulk and building all 40 houses at the same time, they hoped to retire some of the second preferred stock and thereby recover a part of their investment in the land. It was intended from the beginning to pay to the individuals as much as possible of their land costs and the second preferred common stock was designed for the recoupment on the part of the individuals of their expenditure for land.

At meetings of the board of directors of the two Big Spring corporations held on December 15, 1950, the directors of each corporation

authorized the redemption of all of the second preferred common stock. A total amount of $29,193.98 was distributed, $13,137.29 to Payne and $10,785.60 to Walden. These payments were made on December 16, 1950, at which time these petitioners had each owned their redeemed stock for more than 6 months. Payne was paid a total salary of $2,700 and Walden a total salary of $2,100 during the year 1950 by the two Big Spring corporations, which salaries were respectively reported as ordinary income by both individuals.

There were no earnings and profits in the corporations for their fiscal years, each ended March 31, 1951.

In his notice of deficiency mailed to petitioner Walden, respondent states:

In making this determination of your income tax liability careful consideration has been given to the report of examination dated October 1, 1953; to your protest executed January 22, 1954; and to the statements made at the conference held on April 29, 1954.

\*     \*     \*     \*     \*     \*     \*

(a) and (b) Ordinary net income reported by you has been increased by adding thereto the amount of $10,785.60, distributed to you by Big Spring Rental Houses "A", Inc., and Big Spring Rental Houses "B", Inc., out of proceeds of mortgage loans insured by the Federal Housing Administration. Accordingly, the capital gain of $1,192.80 reported by you as resulting from retirement of stock in such corporations has been eliminated.

Similar statements were made to petitioners Payne and Jenkins in respondent's notices of deficiency with the exception of different dates, amounts, and corporations. In the notice of deficiency mailed to Payne the term "net income" is used rather than "ordinary net income." As respects Payne and Jenkins, the reports of examination mentioned in the notices had referred to section 22 (a), I. R. C. 1939, and contained no reference to section 117 (m). As respects Walden, the report of examination specified no section numbers, but used the phrase "Ordinary income in lieu of capital gains." As respects all petitioners, the protests mentioned in the notices dealt, *inter alia*, with section 117 (m). In response to the notices of deficiency, each petitioner filed a petition in this Court specifically raising the issue of the applicability of section 117 (m) of the Internal Revenue Code of 1939.

Each of the six Highland Place corporations and each of the two Big Spring corporations made distributions attributable to circumstances present at the times of their respective construction activities and there were no other compelling facts or reasons for said distributions.

Each of the six Highland Place corporations and each of the two Big Spring corporations was formed or availed of principally for the construction of property with a view to the realization by its

shareholders of gain attributable to the property through distributions to its shareholders, before the realization by the corporations of a substantial part of the net income to be derived from the property.

The gain on the distribution of $59,356.63 to petitioner Payne and $118,713.27 to petitioner Jenkins from the six Highland Place corporations and the gain on the distribution of $13,137.29 to petitioner Payne and $10,785.60 to petitioner Walden from the two Big Spring corporations is taxable at ordinary income rates to each of them separately to the extent that it exceeds their adjusted basis of the redeemed stock.

Petitioners J. T. Jenkins and Myrtle Jenkins filed no declaration of estimated tax for the year 1950. Their final return for 1950 reported rents and royalties of $6,593.91 and salary of $15,450. Their failure to file a declaration of estimated tax was not due to reasonable cause.

Petitioners R. B. Walden and Marcelle Walden also filed no declaration of estimated tax for the year 1950. Their final return for 1950 reported $2,100 in wages and $15,405.53 in business income. Their failure to file a declaration of estimated tax was not due to reasonable cause.

## OPINION.

The facts of this case are strikingly similar to those found in *Raymond G. Burge*, 28 T. C. 246, affd. 253 F. 2d 765 (C. A. 4, 1958); *J. D. Abbott*, 28 T. C. 795, affd. 258 F. 2d 537 (C. A. 3, 1958); *Edward Weil*, 28 T. C. 809, affirmed per curiam 252 F. 2d 805 (C. A. 2, 1958); *Arthur Sorin*, 29 T. C. 959 (1958), on appeal (C. A. 2); and *Glickman* v. *Commissioner*, 256 F. 2d 108 (C. A. 2, 1958), affirming T. C. Memo. 1957–124. This is not an unusual coincidence in view of the fact that in all but one of the above cases the contractual and voluntary arrangements of the taxpayers involved were in large part governed by the necessity of qualifying their corporations' construction projects for F. H. A. mortgage loan insurance.

Petitioners seek to distinguish the holdings of these cases and the application of section 117 (m) of the Internal Revenue Code of 1939 [3]

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

　(m) COLLAPSIBLE CORPORATIONS.—

　　(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

　　(2) DEFINITIONS.—

　　　(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

　　　　(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the

in a number of ways. But before stating petitioners' arguments it should be mentioned that petitioners Payne and Jenkins concede that, to the extent of $16,065.06, the distribution in redemption of their second preferred common stock of the six Highland Place corporations is taxable to them at ordinary income rates. This concession arises from the existence of earnings and profits totaling $16,065.06 in the Highland Place corporations at the date of the redemption and the application of section 115 (g) of the Internal Revenue Code of 1939. The maximum amount of gain which is subject to possible ordinary gain treatment under section 117 (m) is consequently $91,440.04 ($178,069.90, total distributions in redemption of the second preferred common stock of the six Highland Place corporations, minus $16,065.06, the amount treated as a dividend, minus $70,564.80, petitioners' basis for the second preferred common stock).

1. Petitioners' first argument is that section 117 (m) cannot be applied to the facts found here because they had not formed the requisite intent, prior to the completion of construction of the respective projects, to (1) realize gain by stock redemption, and (2) realize gain attributable to construction. While admitting that the capital structure of their eight corporations was designed to permit the withdrawal of excess cash funds through redemption of the second preferred common stock, petitioners nevertheless contend that they "had no idea, intent, or expectation of 'gain' in the expected stock retirement,

---

corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

(B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, or produced property, if—

(i) it engaged in the manufacture, construction, or production of such property to any extent,

(ii) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, or produced the property, or

(iii) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, or produced by the corporation.

(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and

(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production.

For purposes of subparagraph (A), the ownership of stock shall be determined in accordance with the rules prescribed by paragraphs (1), (2), (3), (5), and (6) of section 503 (a), except that, in addition to the persons prescribed by paragraph (2) of that section, the family of an individual shall include the spouses of that individual's brothers and sisters (whether by the whole or half blood) and the spouses of that individual's lineal descendants.

but had continuously planned to recoup 'a part' or all of the cost of the land involved, only."

In advancing this argument we think petitioners overlook realities. Where taxpayers arrange their personal contractual relationships with their controlled corporations in such a way that it can be readily predicted that the costs of the construction of corporate rental properties will be less than the mortgage loan proceeds to be received, and where the same taxpayers choose a form of corporate capitalization which is designed to facilitate the distribution of such excess loan funds, and where such excess loan funds are in fact distributed rather than retained for contingencies or used to reduce the outstanding mortgage obligation of the controlled corporations, then it does not seem inappropriate to hold that the corporations have been formed, or in any event availed of, with the requisite intent present.[4] This factual presentation is within the meaning of the regulations [5] to section 117 (m), which we specifically approved to the extent that they were there applicable in *Edward Weil, supra,* at 815, and which we again approve as a reasonable interpretation of this statute.

Here petitioners' plan, according to Payne, was to "distribute all there was"—presumably whether more or less than original land cost. This spells out the required intent as to the six Highland Place corporations, and in any event all of the distributions here were "attributable to circumstances present at the time of the * * * construction" and no "compelling facts to the contrary" have been shown to negate

---

[4] On cross-examination petitioner Payne described the petitioners' plan in regard to the redemption of the second preferred stock of the six Highland Place corporations as follows :

Q. So the plan from the beginning was to try to recoup the cost of your land, if possible, isn't that true?

A. That's right.

Q. And at the time of this meeting and even before, you had decided that you would distribute *all there was,* you weren't sure at that time how much there was and you inserted the figure later?

A. Yes, I believe it says in here we would distribute *all there was available, all that there was left* and then we inserted the amount that was actually left at a later date when we actually determined that amount. [Emphasis supplied.]

[5] Regs. 111, sec. 29.117–11. (Subsection (b) of this section defines the necessary intent as follows :)

Under section 117 (m) (2) (A), the corporation must be formed or availed of with a view to the action therein described, that is, the sale or exchange of its stock by its shareholders, or a distribution to them, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and the realization by the shareholders of gain attributable to such property. This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, whether by reason of their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated unconditionally, conditionally, or as a recognized possibility. * * *

A corporation is [so] formed or availed of * * * if the requisite view existed at any time during the * * * construction * * *. * * * if the * * * distribution is attributable to circumstances present at the time of the * * * construction * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

the presumption that all eight of these corporations were formed or availed of with the requisite view.

We note that *Glickman* v. *Commissioner, supra,* would support a broader interpretation of the statute than that given by the above regulation [6] and would hold that a corporation may be "availed of" for the proscribed purpose at any time during its corporate life. We do not find it necessary to go that far in view of the facts of the instant case.

2. Petitioners' second argument is that with respect to the Highland Place corporations a substantial part of the net income to be derived from the rental operations was received prior to the distribution in redemption of the second preferred common stock of those corporations. Petitioners' argument on this point stems from the fact that the six Highland Place corporations had earnings and profits for the fiscal year ended July 31, 1950, totaling $16,065.06, whereas in the fiscal year ended July 31, 1951, it is stipulated that the same corporations had net losses totaling $36,959.72, and whereas petitioner Payne testified that the same corporations have had no net income for the 5 following years.

At first blush petitioners' argument appears to have merit. However, after reviewing the project analysis estimates of the F. H. A. for each of the six corporations and the testimony of petitioner Payne on cross-examination, it becomes apparent that the net income expectations of such heavily indebted corporations will necessarily be non-existent or small during the first years of operation and that a normal return of profit to the stockholders can be anticipated only upon a decrease in outstanding corporate indebtedness and, as an incident thereto, reduced interest payments. Inasmuch as the F. H. A.-insured mortgages require the repayment of mortgage loans through equal payments over a period of 391 months, it seems reasonable to conclude that the first 7 years of operation do not provide a fair sampling of corporate net income expectations.

It should also be pointed out that no corporate salaries were paid to corporate officers by the Highland Place corporations in the fiscal year ended July 31, 1950, whereas the corporate minutes of the six corporations indicate that salaries totaling $27,000 were authorized for the period August 1, 1950, through December 31, 1950, and petitioner Payne testified that he presently receives salary payments totaling $24,000 per year from the six Highland Place corporations. In view of this fact it is not surprising that only in fiscal year 1950 were the Highland Place corporations able to show net income.

Furthermore, on this question of net income, the record is far from satisfactory. We are told that total earnings and profits for the

[6] See footnote 5, *supra.*

six corporations for the fiscal year 1950 totaled $16,065.06 and that losses for the fiscal year 1951 totaled $36,959.72 in spite of continuous full occupancy. But, inasmuch as the application of section 117 (m) must be tested in relation to the quantity of net income earned and to be earned by each individual corporation, it is impossible to make any more than a rough guess as to the earnings of any particular one of the six Highland Place corporations. The earnings of the individual corporations would necessarily be different since the record indicates that 1 corporate project was completed about 5 months prior, 2 were completed about 4 months prior, 1 was completed about 2 months prior and 2 were completed only 1 month prior to the end of fiscal year 1950.

Having in mind petitioner Payne's testimony that the Highland Place corporations are current in their payments on the F. H. A.-insured mortgage loans and that the six corporations are providing him with an investment with growth potential as well as current income from salary, we have concluded that the net income of the Highland Place corporations for the fiscal year 1950 does not represent a substantial part of the net income to be derived from the property.

3. Petitioners' third argument is that the limitation of section 117 (m) (3) (B) is applicable to the facts found herein in that less than 70 per cent of the gain of each of the six Highland Place corporations and the two Big Spring corporations is attributable to the property constructed. Petitioners reach this conclusion by subtracting the basis of their second preferred common stock from the stipulated fair market values of the lands on the dates of their contributions of the lands to the respective corporations in return for their second preferred common stock. They then compare this amount with the total gain realized on the redemption of the stock. As mentioned earlier, the amount of $16,065.06 would be excluded from the amount of taxable gain since it represents income taxable under section 115 (g).

The difficulty with petitioners' analysis at this point in respect of both the Highland Place corporations and the Big Spring corporations is that it assumes first, that the unrealized appreciation in the value of the contributed lands is not attributable to "construction" as that term is used in section 117 (m), and second, that a proportionate part of such unrealized appreciation is allocable to the second preferred common stock received by the petitioners on their nontaxable exchange of land for stock, and furthermore, that upon the subsequent redemptions by the Highland Place and Big Spring corporations of the same stock, the "source" of the gain is, to the extent of the allocated appreciation, traceable to appreciation in the land prior to construction of the rental projects.

Petitioners' first assumption is untenable because, as explained in *J. D. Abbott, supra*, at 805, the acts of subdividing property, causing

water and sewer facilities to be installed, installing the streets, obtaining the approval of the municipality, and securing financing by obtaining F. H. A. approval for the projects are just as much a part of "construction" as is the building of the rental dwellings. We stated in that case:

There is no requirement that to be collapsible a corporation must carry the construction through from the beginning to the end of the project. Quite the contrary. That the term "construction" was intended to have its broadest scope is demonstrated by the accompanying phrase "to any extent." * * *

Nor does it make any difference that the preliminary activities of construction just mentioned were accomplished individually by the petitioners rather than by their controlled corporations. Subsection 117 (m) (2) (B) (ii) specifically states that a corporation will be deemed to have constructed property if it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of the person who constructed the property. This subsection is clearly applicable, since the land was received in a nontaxable exchange and petitioners' prior acts in regard to the property constitute "construction."

Petitioners' second assumption is likewise untenable. While it is true that under the basis provisions the basis of property or properties received in a nontaxable exchange is the same as the basis of the property or properties transferred and furthermore that the substituted basis obtained is allocable to the properties received in relation to their fair market values if of more than one kind, still, it does not follow that the "source" of gain upon a subsequent sale of a part only of the properties received will be the same as the "source" of gain had the transferred properties been sold or exchanged in a taxable transaction in the first instance. For example, if petitioners had sold their lands to their corporations in a taxable transaction, then it might be argued with some justification that the gains realized on the sale were attributable to unrealized appreciation in the land. But where, instead of this, petitioners exchange their lands in a nontaxable transaction for two classes of stock, as they did here, and subsequently cause their controlled corporations to redeem one class only of the outstanding stock, then it seems far from certain that the source of the redemption distribution is the land, for prior to the distribution the petitioners own all of the equity stock of the corporations which own the land, and similarly after the distribution the petitioners still own all of the equity stock of the corporations which own the land. In the instant case the only source, other than rental receipts, was the excess mortgage loans. Petitioners' suggestion to the effect that the City of Lubbock sewer and water obligations and the equipment used in the construction of the projects and other personal property of the cor-

porations are additional sources of gain not attributable to construction is clearly erroneous. These "sources" represent nothing more than an overstatement of the actual cost of constructing the property. Whether distributed in kind, or, as in the instant case, by an exchange of checks, they represent an appropriation of excess funds to the redemption of the second preferred common stock of the eight separate corporations.

4. Petitioners' fourth and final argument concerns burden of proof. Their contention in this respect is that respondent's deficiency notices did not inform them of his intention of relying upon section 117 (m) as a ground for his determination of deficiencies and therefore, as a matter of law, respondent must carry the burden of proving every element of section 117 (m) if he is to prevail. Cf. *Thomas Wilson*, 25 T. C. 1058, appeal dismissed (C. A. 4, 1957).

A similar argument was made by the taxpayer in the recent case, *Arthur Sorin, supra*, the notice of deficiency there being phrased "taxable to you at ordinary income tax rates." There are only distinctions without any real difference between this language and the phrases "net income" and "ordinary net income" used in the notices of deficiency in the instant case, and in view of the fullness of our discussion of this issue in *Sorin*, little will be gained from a restatement of our views. The guiding principle is, as was stated in *Sorin:*

It is one thing for respondent to pinpoint the basis of his determination as he did in the *Wilson* and *Weaver* cases. In that situation it is not reasonable to permit him, without notice, to rely on some different and previously undisclosed ground. * * *

But when the determination is made in indefinite and general terms, and is not inconsistent with some position necessarily implicit in the determination itself, the situation is quite different. * * *

Petitioners argue that "pinpointing" was achieved by the Commissioner in respect of Payne and Jenkins since those notices of deficiency referred respectively to previous reports of examination which, in turn, did refer to section 22 (a), I. R. C. 1939. However, those same notices of deficiency also referred to oral statements made at conferences and to those petitioners' protests, each of which dealt with section 117 (m). On this record, petitioners had the burden of proof.

We hold that petitioners have failed to carry their burden of proving that the six Highland Place corporations and the two Big Spring corporations were not availed of principally for the purpose of constructing property with a view to distributions to their stockholders of gain, attributable to such property, prior to the realization by the corporations of a substantial part of the net income to be derived from such property. Respondent argues in the alternative,

but does not strongly urge, that the sums received by petitioners from their corporations were compensation for personal services or for the supplying of materials at cost. We do not believe that the facts here support these alternative positions.

It was stipulated that petitioners J. T. Jenkins and his wife, Myrtle, and petitioners R. B. Walden and his wife, Marcelle, failed to file declarations of estimated tax for the year 1950 as required by section 294 (d) (1) (A). There has been no showing of reasonable cause for this failure to file and the petitioners are therefore liable for the additions to tax prescribed by section 294 (d) (1) (A).

It was further stipulated that petitioners J. T. Jenkins and his wife, Myrtle, are subject to the penalty provided by section 294 (d) (2) for the substantial underestimation of estimated tax. They are therefore also liable for this addition to tax.

*Decisions will be entered under Rule 50.*