ARTHUR POMPONIO AND TERESA POMPONIO, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 76597. Filed March 31, 1960.

*Frederick R. Tansill, Esq.,* for the petitioners.
*Neil J. O'Brien, Esq.,* for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax for the calendar years 1950, 1951, and 1952 in the amounts of $9,374.40, $5,061.38, and $8,445.06, respectively.

The only issue remaining is whether certain cash distributions made by Donna Lee Corporation and Greenbrier Apartments, Inc., in the taxable years are taxable to petitioners as ordinary income or as long-term capital gains. Petitioners concede that the distribu-

tion of $218.84 made by Glebe Apartments, Inc., in the taxable year 1951 is taxable as ordinary income.

Teresa Pomponio is a party here only by reason of having made joint income tax returns with her husband, Arthur Pomponio.

### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Petitioners are husband and wife who resided in Arlington, Virginia, during the taxable years. They filed joint income tax returns for those years with the district director of internal revenue at Richmond, Virginia. Arthur Pomponio will be sometimes referred to as petitioner. He was an experienced builder and real estate developer.

Donna Lee Corporation (hereinafter sometimes referred to as Donna Lee) was incorporated on September 14, 1948, in the Commonwealth of Virginia for the purpose of engaging in the construction and operation of multiple-unit apartments. It used an accrual method of accounting and reported on a fiscal year basis ending August 31.

Petitioner was secretary-treasurer, a member of the board of directors, and a stockholder in Donna Lee. Donna Lee issued 100 shares of no-par common stock on or about September 16, 1948, to petitioner and William Bornstein in equal amounts. Bornstein subsequently transferred 14½ shares to Alfred Bornstein, and 14½ shares to Adolph Klein. There has been no subsequent change in the stock ownership. Petitioner had a cost basis of $500 for his 50 shares. Donna Lee had no authorized shares other than the common stock.

On October 21, 1948, Donna Lee purchased from Parkwood, Inc., a parcel of land containing 12 sections, together with certain improvements thereon, in Parkwood subdivision, Fairfax County, Virginia, for a total price of $145,000, allocated $110,289.35 to the land and $34,710.65 to the improvements. The land was originally acquired by Parkwood, Inc., from John N. Campbell for $93,000.

Donna Lee thereafter constructed in the Parkwood subdivision a multiple-apartment development known as the Donna Lee Apartments. Two buildings were erected on each of the 12 sections. Each building contained 12 or 13 apartments. The total number of apartments in the 12 sections was 291.

Donna Lee obtained $2,360,800 through the Federal Housing Authority (hereinafter sometimes referred to as FHA) insured mortgage loans from various commercial lending institutions. Each of the loans bore interest at the rate of 4 per cent per annum and was to be repaid in 391 equal monthly payments, commencing on

the first day of the 12th month after each loan was made. Twelve separate applications for FHA insurance were originally made by Jesse Johnson as sponsor for Parkwood, Inc., on or about November 5, 1947. On October 12, 1948, FHA agreed to the substitution of petitioner and Bornstein as sponsors of the Donna Lee project. An FHA project analysis was submitted for each of the 12 commitments on February 9, 1948. On the same day, the FHA agreed to insure the mortgages. The first building loan contract was executed on December 8, 1948, and the first architect's agreement was executed on the same date. The first lump-sum construction contracts were entered into between Donna Lee and M. Pomponio & Sons, Inc., for construction of the apartments on December 9, 1948.

Construction of the last two sections of the Donna Lee Apartments was completed on December 19, 1949. The other 10 sections were completed on various dates ranging from June 13, 1949, to November 16, 1949.

The cost to Donna Lee of erecting the Donna Lee Apartments and the cost of the land are as follows:

| | |
|---|---|
| Buildings | $2,083,875.90 |
| Equipment | 62,588.96 |
| Furnishings | 10,303.92 |
| Total costs (excluding land) | 2,156,768.78 |
| Cost of land | 110,289.35 |
| Total costs (including land) | 2,267,058.13 |

Donna Lee commenced receiving rental income from its various apartments, as each building was completed, on dates ranging from March 21, 1949, to November 4, 1949.

Donna Lee has not dissolved and has continued to operate the Donna Lee Apartments to the present time.

Donna Lee computed depreciation upon the buildings using the declining balance method with an estimated life of 40 years.

Returns of Donna Lee for its fiscal years ending August 31, 1949, 1950, and 1951, showed income and deductions as follows:

| Item | 1949 | 1950 | 1951 |
|---|---|---|---|
| Income: | | | |
| Rents | $39,645.41 | $300,030.03 | $323,363.91 |
| Other income | 5.00 | 1,170.00 | 1,884.00 |
| Total income | 39,650.41 | 301,200.03 | 325,247.91 |
| Deductions: | | | |
| Interest | 23,834.44 | 92,266.69 | 93,045.94 |
| Depreciation | 0 | 85,847.92 | 83,565.39 |
| Other deductions | 36,194.55 | 119,230.61 | 137,290.87 |
| Total deductions | 60,028.99 | 297,345.22 | 313,902.20 |
| Net income (or loss) before net operating loss deduction | (20,378.58) | 3,854.81 | 11,345.71 |
| Less net operating loss deduction | 0 | 3,854.81 | 11,345.71 |
| Net income (or loss) | (20,378.58) | 0 | 0 |

Returns of Donna Lee for its fiscal years ending August 31, 1952 and 1953, showed income and deductions as follows:

| Item | 1952 | 1953 |
|---|---|---|
| Income: | | |
| Rents | $331,694.52 | $334,539.62 |
| Other income | 2,944.99 | 3,088.81 |
| Total income | 334,639.51 | 337,628.43 |
| Deductions: | | |
| Interest | 91,546.90 | 89,986.44 |
| Depreciation | 80,942.00 | 78,968.34 |
| Other deductions | 161,463.51 | 172,547.20 |
| Total deductions | 333,952.41 | 341,501.98 |
| Net income (or loss) before net operating loss deduction | 687.10 | (3,873.55) |
| Less net operating loss deduction | 687.10 | 0 |
| Net income (or loss) | 0 | (3,873.55) |

Cash distributions received by petitioner from the formation of Donna Lee through the taxable years are as follows:

| Year | Reported as dividends | Recovery of basis | Reported as capital gains | Total [1] |
|---|---|---|---|---|
| 1949 | 0 | $500.00 | $49,500.00 | $50,000 |
| 1950 | $1,927.40 | 0 | 30,822.60 | 32,750 |
| 1951 | 5,672.85 | 0 | 17,777.15 | 23,450 |
| 1952 | 352.55 | 0 | 23,047.45 | 23,400 |

[1] These amounts are half of the total distributions in each of the years.

Greenbrier Apartments, Inc. (hereinafter sometimes referred to as Greenbrier), was incorporated on May 25, 1948, in the Commonwealth of Virginia for the purpose of engaging in the construction and operation of multiple-unit apartments. It used an accrual method of accounting and reported on a fiscal year basis ending July 31.

Petitioner was secretary-treasurer, a member of the board of directors, and a stockholder in Greenbrier. Greenbrier issued 900 shares of no-par common stock and 100 shares of preferred stock with a par value of $1 per share. All of the preferred shares were issued to the FHA for the sum of $100 and the common shares were issued on or about September 12, 1948, to petitioner, Arthur Hirsch, and Louis Pomponio. Each of the three individuals received 300 shares and they each still retain their stock.

The common shares referred to above were issued to the three subscribers in exchange for conveyance of title to Greenbrier of lots 1 to 5, inclusive, of the subdivision of Greenbrier Apartments, Arlington County, Virginia. Petitioner's cost basis in those shares of stock was $8,333.33.

Greenbrier thereafter constructed in the Greenbrier subdivision a multiple-apartment development known as Greenbrier Apartments.

Petitioner made an application for mortgage insurance to the FHA on February 25, 1948, on behalf of Greenbrier. The FHA project analysis was submitted on April 19, 1948, and on the same day the FHA agreed to insure the loans for $894,600. The principal of the loan was to be amortized in 391 equal monthly payments with interest at 4 per cent per annum and the first payment was not to start before the first day of the 18th month after the effective date of the agreement.

A building loan agreement was executed between Greenbrier as borrower and the Chase National Bank of New York as lender on November 30, 1948, providing for a loan of $894,600. Thereafter, Greenbrier entered into a construction contract with Arthur Pomponio & Sons, Inc., contractors, for the construction of the Greenbrier housing project at a contract price of $804,418.

Construction of the housing project by Greenbrier was completed in 1949 and occupancy commenced in the various apartments between April and August of that year. Total construction cost of the Greenbrier Apartments was as follows:

| | |
|---|---:|
| Buildings | $789,331.18 |
| Equipment | 72,323.86 |
| Furnishings | 3,645.49 |
| Total costs (excluding land) | 865,300.53 |
| Cost of land | 25,000.00 |
| Total costs (including land) | 890,300.53 |

Returns of Greenbrier for its fiscal years ending July 31, 1949 and 1950, showed income and deductions as follows:

| Item | 1949 | 1950 |
|---|---:|---:|
| Income: | | |
| Rents | $15,227.24 | $116,504.67 |
| Other income | 2.76 | 222.06 |
| Total income | 15,230.00 | 116,726.73 |
| Deductions: | | |
| Interest | 11,746.17 | 35,335.76 |
| Depreciation | 0 | 21,663.08 |
| Other deductions | 11,047.73 | 51,568.55 |
| Total deductions | 22,793.90 | 108,567.39 |
| Net income (or loss) before net operating loss deduction | (7,563.90) | 8,159.34 |
| Less net operating loss deduction | 0 | 8,159.34 |
| Net income (or loss) | (7,563.90) | 0 |

Returns of Greenbrier for its fiscal years ending July 31, 1951 and 1952, showed income and deductions as follows:

| Item | 1951 | 1952 |
|---|---|---|
| Income: | | |
| Rents | $113,959.67 | $117,919.34 |
| Other income | 313.38 | 622.03 |
| Total income | 114,273.05 | 118,541.37 |
| Deductions: | | |
| Interest | 35,352.09 | 34,787.78 |
| Depreciation | 21,781.00 | 21,798.15 |
| Other deductions | 55,221.32 | 61,996.15 |
| Total deductions | 112,354.41 | 118,582.08 |
| Net income (or loss) before net operating loss deduction | 1,918.64 | (40.71) |
| Less net operating loss deduction | 1,918.64 | (14.86) |
| Net income (or loss) | 0 | (55.57) |

Greenbrier received gross rental income of $122,145 for the fiscal year ended July 31, 1953.

Cash distributions received by petitioner from the formation of Greenbrier throughout the taxable years were as follows:

| Year | Reported as dividends | Recovery of basis | Reported as capital gains | Total [1] |
|---|---|---|---|---|
| 1950 | $2,719.78 | $8,333.33 | $3,175.33 | $14,228.44 |
| 1951 | 0 | 0 | 0 | 0 |
| 1952 | 0 | 0 | 1,300.00 | 1,300.00 |

[1] These amounts are one-third of the total distribution in each of the years.

In the statutory notice of deficiency respondent increased the net income disclosed by the joint return of petitioners for each of the taxable years.

The net income for 1950 was increased by $16,998.97 and explained as follows (Note: petitioner's cost of Donna Lee stock of $500 was recovered in 1949 out of the distribution of $50,000 in that year):

It is held that the excess of the distributions received from Donna Lee Corporation and Greenbrier Apartments, Incorporated, over the cost of the stock of said corporations is taxable as ordinary income and not as long-term capital gains as reported on your return. Therefore, taxable net income has been increased in the amount of $16,998.97 computed as follows:

| | | |
|---|---|---|
| Distribution from Donna Lee Corporation | $32,750.00 | |
| Less: Amount reported as dividends | 1,927.40 | $30,822.60 |
| | | |
| Distribution from Greenbrier Apartments, Inc | 14,228.44 | |
| Less: Amount reported as dividends __ $2,719.78 | | |
| Basis of stock _____ 8,333.33 | 11,053.11 | 3,175.33 |
| Total | | $33,997.93 |
| Net taxable capital gain reported on your return | | 16,998.96 |
| Adjustment | | $16,998.97 |

The net income for 1951 and 1952 was increased by $8,998 and $12,173.73, respectively, with explanations substantially the same as

the above explanation given for the increase in net income for 1950.

Petitioners have not shown that they relied on any statement, document, or purported policy of the respondent or of his delegates in causing Donna Lee and Greenbrier to make the cash distributions in the taxable years.

The cash distributions made to petitioner during the taxable years by Donna Lee and Greenbrier in excess of the amounts reported by petitioner as dividends and the cost to petitioner of his stock in those corporations are taxable to petitioners as ordinary income and not as long-term capital gain.

OPINION.

The respondent contends that the "cash distributions" made to petitioner during the taxable years by Donna Lee and Greenbrier in excess of the amounts reported by petitioner as dividends and the cost to petitioner of his stock in those corporations are taxable to petitioners as ordinary income under section 117 (m) of the Internal Revenue Code of 1939,[1] and not as long-term capital gain under

---

[1] Subsection (m) of section 117 of the Internal Revenue Code of 1939 was added to the Code by section 212 of the Revenue Act of 1950, effective for years ending after December 31, 1949, and is as follows:

SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

*      *      *      *      *      *      *

(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (1) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation * * *;

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and

(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production. * * *

Paragraphs (2) and (3) of section 117(m) were later amended by section 326 of the Revenue Act of 1951 by adding thereto other provisions relating to the purchase of inventories with which we are not here concerned.

section 115(d)[2] of said Code. The question is fully raised by the pleadings.[3]

Petitioner's first argument or contention is that a necessary prerequisite to the application of paragraph (1) of section 117(m) is that there be a "sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation * * *." Petitioner points out that subsection (m) is made up of three paragraphs called (1) treatment of gain to shareholders, (2) definitions, and (3) limitations on application of subsection. He calls our attention to the fact that only in paragraph (2) does the phrase "or a distribution to its shareholders" appear, and argues that since in the taxing and limitation paragraphs (1) and (3), respectively, the statute deals only with gain or loss from the sale or exchange of stock in a collapsible corporation, one cannot apply subsection (m) to a case where there has been no sale or exchange of stock but, as here, only "cash distributions" to the stockholders.

This argument has been previously considered and rejected in *Raymond G. Burge*, 28 T.C. 246, 263, affd. 253 F. 2d 765, 769 (C.A. 4, 1958), and in *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2, 1958), affirming T.C. Memo. 1957-124. In the *Glickman* case the taxpayers organized a corporation to construct an apartment project with an FHA-insured loan. The cost of construction was $55,400 less than the amount of the loan. On January 13, 1950, the corporation made a cash distribution of $55,000 to its common stockholders which was $53,000 in excess of the cost basis to the stockholders of their stock. On August 1, 1950, the common stockholders sold their stock for a total price of $93,646.79. In affirming our decision that the gains realized by the taxpayers both from the *cash distribution* on January 13, 1950, and from the sale of their stock on August 1, 1950, should be taxed as *ordinary* income pursuant to section 117(m), the Second Circuit said:

In Point IV of their brief the petitioners argue that § 117(m) does not apply to the cash distribution received by them on January 13, 1950. A similar contention was made and overruled in the Burge case. It will suffice to say that we are in agreement with the reasons given by the Tax Court and by Judge Parker for rejecting it.

---

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(d) OTHER DISTRIBUTIONS FROM CAPITAL.—If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. * * *

[3] The fact that respondent neither cited nor averted to section 117.(m) in the statutory notice is immaterial. *Arthur Sorin*, 29 T.C. 959, affirmed per curiam (C.A. 2, 1959); *Rose Sidney*, 30 T.C. 1155, 1162, affd. (C.A. 2, 1960).

It may be noted before passing petitioner's first argument that in *Rose Sidney*, 30 T.C. 1155, affd. 273 F. 2d 928 (C.A. 2), there were no sales or exchanges of stock but only distributions to the stockholders. There, the taxpayers did not argue the point which is pressed here so strenuously that a necessary prerequisite to the application of section 117(m) is that there be a sale or exchange of stock. It was held, however, that the said distributions were taxable as ordinary income pursuant to section 117(m).

Petitioner also argues and contends that neither Donna Lee nor Greenbrier was a "collapsible corporation" as that term is defined in section 117(m)(2)(A)(i) for the reason that each corporation realized a substantial part of the "income" to be derived from its properties prior to the cash distributions here in question. Petitioner points to the large amount of rentals received by both corporations during the taxable years and concludes that "on any reasonable basis of comparison the rental incomes would appear to be 'substantial' in the case of both corporations."

The fallacy of petitioner's reasoning is that he applies the statute as if it read "income" rather than "net income" in the phrase "prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property." Petitioner, in making the test, considers only the rentals received during the taxable years without taking into consideration the expenses of operations such as interest, depreciation, and other deductions. As shown in our findings, when consideration is given to the latter items, neither corporation reported any substantial *net* income. In *Rose Sidney*, *supra*, we said (p. 1163):

In determining what is "a substantial part of the net income to be derived from such property" we must consider the relationship between the net income realized by the corporations prior to the distributions and the whole of the net income which may be reasonably anticipated to be derived from such property. * * *

Since petitioner has not shown the whole of the net income which may be reasonably anticipated to be derived from the properties, namely, the multiple-unit apartments, we conclude that petitioner has failed to prove that the corporations realized a substantial part of the net income to be derived from their properties prior to the cash distributions in question. *Rose Sidney*, *supra*; *Leland D. Payne*, 30 T.C. 1044, 1057, affd. 268 F. 2d 617 (C.A. 5); *R. A. Bryan*, 32 T.C. 104, 127, on appeal (C.A. 4); *Max Mintz*, 32 T.C. 723, 741, on appeal (C.A. 2). In so concluding, we do not reach the question that was before this Court in *James B. Kelley*, 32 T.C. 135, 147–154, on appeal (C.A. 5).

Petitioner also argues and contends that "[i]f land costs are included as part of the total costs of construction for both Donna Lee and Greenbrier it will follow that there was no surplus mortgage money available to distribute to Pomponio in any of the taxable years by Donna Lee and in the case of Greenbrier only a small sum in 1950." Petitioner then points out from our findings that in the case of Donna Lee the total loans aggregated $2,360,800; that the total cost of erecting the Donna Lee Apartments (*inclusive* of the cost of the land of $110,289.35) was $2,267,058.13; that the surplus borrowings amounted to the difference between the loans and the cost, or the amount of $93,741.87; that since $100,000 of cash was distributed in 1949 (a year not before us) there remained no surplus borrowings to distribute in the taxable years; and that, therefore, the cash distributions made during the taxable years must have come from rentals and related kinds of income. Petitioner makes substantially the same analysis in the case of Greenbrier.

We see no merit in this argument. The taxpayers in *Rose Sidney*, *supra*, argued likewise and the argument was rejected. In that case we said (p. 1166):

Petitioners make a further argument to the effect that even though the corporations are deemed collapsible corporations within the meaning of section 117(m), only a portion of the cash distributions made by them is taxable under that section because such distributions (to the extent that they were not ordinary dividends paid from current earnings) were in amounts less than the excess of the mortgage proceeds over the "total cost of construction." The fallacy in this argument lies in the fact that petitioners have included in the "total cost of construction" the cost of the land. On the authority of *Elizabeth M. August*, 30 T.C. 969, this argument is rejected.

Finally, petitioner makes the statement in his brief that it was the respondent's policy and practice during the taxable years to allow the reporting of distributions precisely as handled by the petitioner, and argues that the respondent should not be permitted at this late date to attack such a reporting method. Petitioner has not proven the factual background for such an argument but, even if he had, there would be no merit to the argument. Even if it were shown that the respondent continued for some time after December 31, 1949, to tax such cash distributions as are here involved as long-term capital gains, contrary to the provisions of section 117(m), he would not be bound by such a mistaken application of the law. *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180.

We hold that the respondent did not err in taxing the cash distributions here in question to petitioners as ordinary income.

*Decision will be entered for the respondent.*