JESSE HARTMAN AND DOROTHY S. HARTMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65826. Filed September 22, 1960.

*Michael Gould, Esq.*, and *S. Walter Kaufman, C.P.A.*, for the petitioners.

*Anthony S. Del Guidice, Esq.*, for the respondent.

FORRESTER, *Judge:* The respondent determined deficiencies in income tax for the calendar years 1950 and 1951 in the respective amounts of $40,150.77 and $28,288.62. The sole issue for our determination is whether certain cash distributions made by Second Fair

Lawn Corporation and Third Fair Lawn Corporation are taxable to petitioners as ordinary income or as long-term capital gains.

FINDINGS OF FACT.

Some of the facts have been stipulated, are so found, and are incorporated herein by this reference.

Petitioners are husband and wife and reside in New York, New York. They filed joint income tax returns for the calendar years 1950 and 1951 with the collector of internal revenue for the third district of New York. Jesse Hartman will hereinafter be referred to as Hartman.

Hartman had considerable experience in the real estate construction business. On January 27, 1949, and July 11, 1949, respectively, he organized Second Fair Lawn Corporation (hereinafter referred to as Second Fair Lawn) and Third Fair Lawn Corporation (hereinafter referred to as Third Fair Lawn) under the laws of the State of Connecticut. The corporations were formed to construct and operate housing projects. At all times here material, Hartman held all the outstanding common stock of both corporations and was president and a director of each. The Federal Housing Administration (hereinafter referred to as FHA) was the owner of all the preferred stock.

By warranty deeds dated March 11, 1949, and August 4, 1949, respectively, Second Fair Lawn and Third Fair Lawn acquired separate parcels of land in Stamford, Connecticut, as sites for their proposed buildings.

Hartman financed the construction on both sites, pursuant to the provisions of section 608 of the National Housing Act, by first applying for a mortgage from private lending institutions and then having the proposed mortgagee (with Hartman as sponsor) apply to the FHA for mortgage insurance. Thus, Hartman secured Fidelity Title & Trust Company as mortgagee on both projects.[1] Then, an application having been filed with the FHA under the prescribed procedure, the FHA agreed to insure the mortgages on the two projects. The commitments were issued on November 26, 1948, and May 25, 1949, respectively.

The schedule below (with the amounts rounded to the nearest dollar) compares the estimated and actual costs of construction and sets forth the insurance commitment of the FHA on each project (in both cases the mortgagee agreed to and did advance the sum for which the FHA had issued a commitment):

---

[1] Subsequent to obtaining the FHA commitments on each project, at times not otherwise material herein, the Greenwich Savings Bank replaced Fidelity Title & Trust Company as mortgagee on each project.

|  | Second Fair Lawn | Third Fair Lawn |
|---|---|---|
| Estimated total cost [1] | $1,235,000 | $1,425,000 |
| Equity of corporation [1] | 110,000 | 125,000 |
| Amount of loan for which insurance requested | 1,125,000 | 1,300,000 |
| FHA commitment | 1,080,000 | 1,181,000 |
| Actual costs expended [1] | 956,235 | 921,093 |
| Unused mortgage proceeds | 123,765 | 259,907 |
| Per cent of excess to actual costs | 12.9 | 28.2 |

[1] Exclusive of land owned by corporations.

The above estimates included the following amounts for architects' and contractors' fees:

|  | Second Fair Lawn | Third Fair Lawn |
|---|---|---|
| Contractors | $53,200 | $61,451 |
| Architects | 55,860 | 64,524 |
| Total | 109,060 | 125,975 |

Second Fair Lawn contracted to pay the architect only $8,500 and actually paid him only $8,300 for his services. Third Fair Lawn contracted to pay the same architect $6,801 and actually paid him that amount. Both contracts were signed by Hartman as president of the respective corporations.

Each corporation was its own contractor and no contractor's fees were ever intended to be paid, or in fact paid, with respect to either project. Hartman was the overseer in charge of construction on both projects.

The schedule below indicates the dates on which various steps in the construction occurred:

|  | Second Fair Lawn | Third Fair Lawn |
|---|---|---|
| Final certificate of occupancy issued | Sept. 9, 1949 | May 26, 1950 |
| Construction superintendent left project | Oct. 1949 | June 1950 |
| Final endorsement of mortgagee [1] | May 4, 1950 | Oct. 13, 1950 |

[1] At this time the final advance of funds was made to the respective corporations in the amounts of $129,248 and $140,878.

At a meeting of Second Fair Lawn's three-man board of directors held on December 1, 1950, the land and improvements comprising the corporation's project were appraised at $1,250,000 and the board thus decided to write up the value of these assets by increasing capital surplus in the amount of $256,961.90. On December 8, 1950, the

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

board then voted a distribution out of capital surplus to Hartman in the amount of $100,000. This amount was paid on December 18, 1950.

Similarly, on June 11, 1951, Third Fair Lawn's board of directors (consisting of the same three parties who were on Second Fair Lawn's board) appraised its land and improvements at $1,250,000 and thus wrote up their value by increasing capital surplus in the amount of $263,789.90. Then, on June 25, 1951, the board voted a distribution out of capital surplus to Hartman in the amount of $75,000. Such amount was paid on June 30, 1951.

Petitioners reported these amounts on their 1950 and 1951 returns, respectively, as long-term capital gains, labeling them as "Distribution[s] not out of earnings or profits."

The net income and the earned surplus and undivided profits of the corporations for the periods in question were as follows:

| | Second Fair Lawn | | Third Fair Lawn | |
|---|---|---|---|---|
| | 1949 | 1950 | Fiscal year ended June 30— | |
| | | | 1950 | 1951 |
| Net income (loss)_____ | $3,152.88 | $14,170.38 | ($3,170.48) | [1] $33,524.50 |
| Earned surplus and undivided profits_____ | 2,489.70 | 3,141.70 | 0 | 1,180.21 |

[1] Before net operating loss deduction on account of net operating loss carryover from preceding year.

At every phase of construction of each of these projects, Hartman was aware of the amount of money actually expended, and prior to completion of construction on each project, he was aware that the mortgage proceeds would be in excess of the funds actually needed for construction.

Both corporations were availed of principally for the construction of properties with a view to the realization by their sole common shareholder of gain attributable to such properties through distributions to that shareholder before the realization by the respective corporations of a substantial part of the net income to be derived from such respective properties.

OPINION.

### 1. Cash Distributions Under Section 117(m).

This case presents a familiar factual pattern involving a statutory provision which has produced frequent litigation resulting in a harmony of decision quite singular in a field so beset with uncertain distinctions and obscure definitions as is the Federal tax law.

Section 117(m)[2] was first added to the 1939 Code by section 212 of the Revenue Act of 1950 to thwart the "device which has been used in an attempt to convert ordinary income into long-term capital gain by use of a temporary corporation." S. Rept. No. 2375, 81st Cong., 2d Sess., 1950–2 C.B. 516. This same committee report made it apparent that, considering the varied ingenious methods by which such conversions are sought to be effected, the section was to frustrate the efforts of taxpayers along this line no matter what means were used to produce this coveted goal. *Raymond G. Burge*, 28 T.C. 246 (1957), affd. 253 F. 2d 765 (C.A. 4, 1958). As the Senate report noted (1950–2 C.B. 547):

> While the primary use made of collapsible corporations in the past has usually involved their liquidation in the manner indicated above, it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation by selling their stock to outside interests at the time and under the circumstances when the corporation might otherwise be liquidated. In like manner, the corporation might distribute the property in question without liquidating and, under section 115(d), the value of the property distributed, to the extent that it was not a dividend, would first be applied against the adjusted basis of the stock to the shareholders and the excess, if any, would be taxable in the same manner as a gain from the sale or exchange of property. *Paragraph (1) of the subsection, in prescribing the treatment to be given the gain from the sale or exchange of stock of a collapsible corporation, is deemed to refer to this excess value in the case of a distribution made by the corporation other than in liquidation.* * * * [Emphasis supplied.]

Against this legislative background, taking into account the several alternative patterns of abuse of the corporate device, we consider as quite feeble petitioners' contention that while section 117(m) embraces sales or exchanges of stock and distributions in liquidation of "collapsible corporations," it does not reach comparable distribu-

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

tions by such corporations unaccompanied by liquidation.[3]  In *Glickman* v. *Commissioner*, 256 F. 2d 108, the United States Court of Appeals for the Second Circuit affirmed a Memorandum Opinion of this Court in which we said (in contrasting the case then under discussion with the *Burge* case): "The main difference is a *mere matter of detail* in that the distribution made in the present case was not accompanied by redemption of any of the corporation's stock. * * *" (Emphasis supplied.)  Also, more recently in *Arthur Pomponio*, 33 T.C. 1072 (1960), on appeal (C.A. 4), we squarely held that the fact that a cash distribution was unaccompanied by a surrender of stock in the corporation was completely immaterial. It would seem especially pointless here to attach any meaning to the circumstance that Hartman, *the sole owner of the common stock*, did not go through the motions of surrendering some of his shares.

Furthermore, it is well to bear in mind the often-cited note of caution sounded by the late Chief Judge Parker, speaking for the Fourth Circuit, in affirming our decision in the *Burge* case, *supra*, 253 F. 2d at 767:

Because the basic type of transaction which gave rise to the legislation involved the use of temporary corporations which were dissolved and their proceeds distributed after tax avoidance had been accomplished, the term "collapsible corporation" was employed to describe the corporations used for this form of tax avoidance; but the statute was drawn in broad general terms to reach the abuse which had arisen, whatever form it might take.

The Treasury regulations likewise take the same position,[4] but petitioners urge us to follow a prior, and apparently contrary unpublished ruling issued by a Deputy Commissioner to *another* taxpayer on November 30, 1950.

Assuming, without deciding, that such ruling was made upon facts comparable to those in the instant case, we must still decline to follow it.  A similar ruling was urged upon the Fourth Circuit in the *Burge* case and there rejected, 253 F. 2d at 770, as follows:

it is well settled that it is not to be accorded the weight of a regulation.  As said by the Supreme Court in Helvering v. New York Trust Co., 292 U.S. 455,

---

[3] Petitioners argue that such distributions should fall under section 115(d) of the 1939 Code, which provides:

(d) OTHER DISTRIBUTIONS FROM CAPITAL.—If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property.  This subsection shall not apply to a distribution in partial or complete liquidation * * *

[4] Section 39.117(m)-1(a) of Regulations 118 provides:

Sec. 39.117(m)-1 *Collapsible corporations*—(a) *In general.*  Subject to the limitations [not here relevant], the entire gain from * * * (3) a distribution made by a collapsible corporation which, under section 115(d), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property, shall be considered as gain from the sale or exchange of property which is not a capital asset.

468, * * * such rulings "have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of the law." See also our recent decision in Sims v. United States, 4 Cir., 252 F. 2d 434.

The Supreme Court has also held that even published rulings "have none of the force or effect of Treasury Decisions." *Helvering* v. *N.Y. Trust Co.*, 292 U.S. 455, 468 (1934). The Court there called attention to the legend which then (as in 1950) appeared in bold type in the preface to the Cumulative Bulletin: "SPECIAL ATTENTION is directed to the cautionary notice on this page that published rulings of the Bureau do not have the force and effect of Treasury Decisions * * *.

Petitioners next contend that the congressional enactment of section 312(j) of the 1954 Code [5] shows that Congress did not intend to reach these distributions until 1954. We have answered this identical argument adversely to petitioners' contention in *Raymond G. Burge, supra* at 263 and 264. We note here (as we did in *Burge*) that the Senate Finance Committee report with regard to section 312(j) provides that the committee "intends that no implication be drawn from the enactment of this subsection with respect to any decision made or litigation pending under present law with respect to this subject matter, whether or not such loans are made, guaranteed, or insured by the United States, or with respect to any other provision of this bill which may be relevant to the same subject matter, such as section 341, relating to collapsible corporations."

Accordingly, we hold that section 117(m) applies to the cash distributions here in issue.

### 2. *"View" Under Section 117(m)(2)(A).*

These distributions are each thus taxable as ordinary income if made by a corporation which is "collapsible" as that term is defined in section 117(m)(2)(A).[6] The only point of disagreement between the parties as regards that definition is whether Hartman had the requisite "view" under that section.

---

[5] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

(j) DISTRIBUTION OF PROCEEDS OF LOAN INSURED BY THE UNITED STATES.—

(1) IN GENERAL.—If a corporation distributes property with respect to its stock, and if, at the time of the distribution—

(A) there is outstanding a loan to such corporation which was made, guaranteed, or insured by the United States (or by any agency or instrumentality thereof), and

(B) the amount of such loan so outstanding exceeds the adjusted basis of the property constituting security for such loan, then the earnings and profits of the corporation shall be increased by the amount of such excess, and (immediately after the distribution) shall be decreased by the amount of such excess. * * *

(2) EFFECTIVE DATE.—Paragraph (1) shall apply only with respect to distributions made on or after June 22, 1954.

[6] See footnote 2, *supra.*

Petitioner neither argues nor attempts to prove that these distributions were not made prior to the realization by the respective corporations of a substantial part of the net income to be derived from these housing projects, but argues, based upon his own testimony, that he never had any intent (view) to make the distributions until each respective construction was fully completed and the idea and advice to do so was given to him by his accountants. But, of course, we must weigh this manifestly self-serving testimony against the background of the actual events which have occurred. *Edward Weil*, 28 T.C. 809 (1957), affirmed per curiam 252 F. 2d 805 (C.A. 2, 1958).

Furthermore, it is well settled that the requisite view exists if the intention to distribute funds (or liquidate or sell the stock) is formed at any time prior to completion of construction. *Glickman* v. *Commissioner, supra; Raymond G. Burge, supra; Edward Weil, supra; Leland D. Payne*, 30 T.C. 1044 (1958), affd. 268 F. 2d 617 (C.A. 5, 1959) ; *C. D. Spangler*, 32 T.C. 782 (1959), affd. 278 F. 2d 665 (C.A. 4, 1960), certiorari applied for July 15, 1960. The regulations are in accord [7] and have been approved by all of these cases. They also provide:

if the sale, exchange, or distribution is attributable to circumstances present at the time of the * * * construction * * * the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

This latter portion of the regulations was specifically approved by the Fourth Circuit in the *Spangler* case, 278 F. 2d 665. There, as here, the attempt to convert ordinary income into capital gain occurred after completion of the project; but the court, relying on the above-quoted part of the regulations, held that the Tax Court had properly found that the view nevertheless existed.

The portion of the regulations here quoted seems to state but a logical and necessary inference which a reasonable mind must draw from a record like the one before us. Thus, ignoring for the moment such compelling evidence as the great disparity between estimated architects' and contractors' fees and those actually paid (a disparity of over $100,000 as to each project) and assuming *arguendo* that Hartman lacked the prescribed view when the respective projects were commenced, we cannot help but find that he had the view before completion of construction. Hartman himself testified, and the record compels us to find that he knew, as the project progressed, that there would be excess funds at the disposal of both corporations after all costs were paid.

Indeed, the spirit of the entire "collapsible corporation" section would be seriously evaded if we were to attach the significance urged

[7] Regs. 111, sec. 29.117–11(b).

by petitioner to the very nice distinction that here the *formal distribution* occurred after the completion of the project.

*Decision will be entered for the respondent.*