JACK AND CELIA FARBER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72134. Filed September 29, 1961.

*Andrew F. Oehmann, Esq.*, for the petitioners.
*Theodore E. Davis, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax and additions thereto for the taxable years 1952, 1953, and 1954 as follows:

| Year | Income tax | Addition to tax sec. 294(d)(2) |
|---|---|---|
| 1952 | $81,790.56 | $4,799.80 |
| 1953 | 25,209.35 | 1,251.86 |
| 1954 | 21,839.68 | 1,160.75 |

The principal issues presented are whether the gain realized by the petitioners from the sale of 100 shares of the Eagle Mount Corporation stock constituted ordinary income under section 117(m) of the Internal Revenue Code of 1939, as determined by the respondent, or long-term capital gain; whether such gain is all taxable in the year 1952 or whether it is taxable in 1953 and 1954 on the installment basis; whether the assessment of the tax for the year 1952 is barred by the statute of limitations; and whether petitioners are liable for additions to tax under section 294(d)(2) for substantial underestimation of estimated tax for the years 1952, 1953, and 1954.

Adjustments will be made under Rule 50 in accordance with agreements between the parties as to other issues.

FINDINGS OF FACT.

Some of the facts are stipulated and the stipulations, including the stipulated exhibits, are incorporated herein by this reference.

The petitioners are husband and wife residing in West Hempstead, Nassau County, New York. They filed timely joint income tax returns for the taxable years 1952, 1953, and 1954 with the district director of internal revenue, Brooklyn, New York. Jack Farber will hereinafter be referred to as petitioner.

Petitioner has lived on Long Island, New York, all his life. He completed college and law school. He was admitted to the New York State bar in 1937, but has never actively practiced law. Commencing in 1939 he engaged in varied real estate work. He initially purchased one-family dwellings. Later he began constructing apartment houses which he retained and managed as investment properties and which were his main source of revenue. He determined that it was advisable to use the corporate form of business and since 1939 he has formed four or five corporations of which most are still in existence.

In May 1950 the petitioner formed Eagle Mount Corporation, hereinafter referred to as Eagle Mount. At that time he and another individual were attempting to acquire property near Mount Vernon, New York, but since they were unsuccessful in acquiring that property Eagle Mount remained dormant until 1951 when it entered into the

transactions hereinafter described. At all times pertinent herein the petitioner was the sole stockholder of Eagle Mount, and he and his wife were the directors.

On July 18, 1951, petitioner contracted to purchase from the Gross-Morton Land Corporation a tract of land in the village of Garden City, town of Hempstead, Nassau County, New York. The contract price for the land was $46,000, payable $3,000 upon execution of the contract, $7,000 upon delivery of the deed of conveyance, and the balance of $36,000 2 years from the date of closing of title. The $36,000 balance was to be secured by a purchase money mortgage on the property and the mortgagor was to have the privilege of prepayment in multiples of $100 and the right to releases of parcels of the property of not less than one acre each. Petitioner made the $3,000 downpayment on July 18, 1951.

The tract of land was unimproved and was covered with scrub oak. It adjoined Boylston Street, which was paved, but the only street through the property was Grove Street which paralleled Boylston Street, and was not paved. The land had been subdivided on an existing map into 20-foot lots on streets plotted thereon, but none of these streets had been cut through or cleared or marked off. One block to the east of Grove Street was the boundary line of Mitchell Air Force Base, and the property in question was subject to a navigation easement, which restricted the height of houses in the area because of planes passing over the property on approaches to and takeoffs from landing strips at the airbase. In the area directly northeast of the property there was a commercial and industrial area where oil companies had storage tanks and where there was a railroad spur. Adjoining the property on the south was a large kennel. The seller, Gross-Morton Land Corporation, was a developer of residential properties, which had attempted, without much success, to develop adjacent land west of the property involved by the construction of one-family homes in 1950 and 1951 in the price range of $15,000 to $18,000. It had been unable to sell the houses readily due to the character of the area. In other areas on Long Island the market for sales of houses was good.

The petitioner entered into the contract to purchase the land for the purpose of its development by the erection of homes in a lower price range. He was aware of the character of the area and of the experience of the Gross-Morton Land Corporation in attempting to develop adjacent land, and had some doubt as to the success of the undertaking. However, he believed that there was a possibility that a development consisting of modest homes might prove successful.

On July 25, 1951, petitioner assigned to Eagle Mount all his right, title, and interest in the contract of July 18, 1951, with the Gross-Morton Land Corporation and in the $3,000 downpayment, and Eagle

Mount assumed petitioner's obligations under the contract. The petitioner assigned the contract to Eagle Mount because he had some doubt as to the success of the project and because he did not wish to become personally liable for any deficiency judgment. Accordingly it was agreed that Eagle Mount, rather than the petitioner, should execute a bond in favor of the Gross-Morton Land Corporation.

On or about May 8, 1952, the sale of the land was consummated between Gross-Morton Land Corporation and the petitioner's assignee, Eagle Mount, in accordance with the agreement, except for the adjustment of the purchase price to $45,500. The land was conveyed to Eagle Mount, which paid Gross-Morton Land Corporation an amount of $7,202.46 (which included $202.46 local taxes) and delivered to such corporation its 6 percent promissory note for $35,500, due May 8, 1954, secured by a purchase money first mortgage on the land. The amount of $7,202.46 paid by Eagle Mount had been furnished to it by the petitioner. Thereafter Eagle Mount or the petitioner on its behalf made arrangements with an architect to revise the map to show 60-foot lots instead of 20-foot lots, in accordance with the requirements of the village of Garden City. The architect was paid $300 on account. Application was made to the village for permits for the erection of 29 houses, for which an amount of $3,581.50 was paid. In connection therewith, it was necessary to make arrangements with the village for water, sewers, and street improvements. A bond was filed by Eagle Mount to secure payment for such improvements, for which a premium of $546 was paid. There was also paid to the village $6,200 as a deposit for the purchase of materials for the improvements and $1,334 as advance payment for utility connections. Eagle Mount also filed applications with the FHA for conditional commitments, pursuant to title II, section 203 of the National Housing Act (12 U.S.C. 1709(i)) to insure loans covering 29 single-family houses to be built, in connection with which it paid fees of $1,305 to the FHA. The total of the above amounts is $13,266.50, which was advanced by the petitioner.

After the conveyance of the land to Eagle Mount on or about May 8, 1952, and prior to November 1952, the petitioner was contacted by representatives of Bernard and Albert Genchi, two brothers who had recently completed a development in the adjoining county of Queens, but with whom the petitioner had not previously been acquainted. They wanted to acquire the project in question, but the petitioner refused to sell. However, after further negotiations the petitioner and the Genchi brothers reached an agreement for a participation of the Genchi brothers, which contemplated the formation of a new corporation upon the insistence of counsel for the Genchi brothers. Accordingly, on November 5, 1952, a new corporation, Eagle Garden Homes, Inc., hereinafter referred to as Eagle Garden, was organized. Ber-

nard Genchi was president and a director, Albert Genchi was vice president and a director, petitioner was secretary-treasurer and a director, and Celia Farber was a director. The authorized capital stock was 200 shares, no par value, of which 30 shares were issued as follows: Petitioner, 15 shares; Bernard Genchi, 10 shares; Albert Genchi, 5 shares. The consideration paid was $1,000 per share, or a total capital investment of $30,000.

On November 18, 1952, an agreement was executed by the petitioner, Bernard Genchi, Albert Genchi, and Eagle Garden which provided for the acquisition by Eagle Garden from petitioner of his 100 shares of capital stock of Eagle Mount for $160,000, to be evidenced by a promissory collateral note of Eagle Garden in that amount, bearing interest at 4 percent per annum, payable semiannually until November 5, 1955, when the principal sum should become due and payable. It was provided that the note might be prepaid in whole or in part at any time in multiples of $1,000. The 100 shares of stock were to be held by petitioner as collateral security until the total amount of $160,000 should be paid. The agreement described 10 parcels of land owned by Eagle Mount and recited that Eagle Mount was indebted under a note and mortgage in the principal amount of $35,500 covering a part of the 10 parcels described and other real estate not included in this transaction. It was agreed that the petitioner should make payments on that mortgage and obtain releases therefrom as payments were made on the purchase price of $160,000 for the stock of Eagle Mount, and that petitioner should pay the interest on the mortgage and pay the balance of the mortgage on maturity out of his own funds. It was also provided that the amounts theretofore furnished by the petitioner for architect's fees, FHA fees, etc., should be repaid to the petitioner by Eagle Garden.

It was provided in the agreement that the petitioner on the one hand, and the Genchi brothers on the other, would loan money to Eagle Garden in an amount up to $10,000 upon the demand of one or the other, such loan to be evidenced by notes of Eagle Garden, carrying interest at 4 percent, and that Eagle Garden should not vote any dividends or pay any money to any stockholder, other than as set forth in the agreement, until all such loans should have been repaid, as well as the indebtedness of Eagle Garden to petitioner of $160,000, plus interest.

It was contemplated that one-family houses in the price range of $13,000 or less should be erected by Eagle Garden on the parcels of land described and that supervision of the construction thereof for and in behalf of Eagle Garden should be solely the responsibility of the Genchi brothers, one or the other of such brothers to devote his full time and energy thereto, and that the role of the petitioner should be solely that of a consultant. It was further provided that Eagle

Garden should pay to the Genchi brothers for their supervisory service a maximum fee of $250 per house, such fee, however, to be reduced to the extent of $10 for each $100 profit which the corporation realized on each house above $800, limited to a minimum fee per house of $130. The fee on each house was to be paid fractionally at various stages of construction.

In the contract it was agreed that the stock ownership in Eagle Mount transferred to Eagle Garden should reflect ownership in Eagle Mount only to the extent of the 10 parcels of real estate described and in nothing else held by Eagle Mount, and it was provided that Eagle Mount might transfer to the petitioner or his designee any and all other assets, including any real estate covered by the $35,500 mortgage not included in the 10 parcels described, free of any claim of any of the parties to the contract against Eagle Mount or the petitioner.

It was further provided that upon the payment to the petitioner by Eagle Garden at any time of $2,500, plus accrued interest to date of payment, the same to be applied in reduction of the indebtedness of $160,000, the petitioner would obtain from Eagle Mount a deed for any designated building plot and himself execute a deed covering the same to Eagle Garden, and that petitioner would, at his own cost, obtain a release of such building plot from the underlying first mortgage of $35,500.

It was also agreed that Eagle Garden should assume the existing agreement with the architect calling for a fee of $30 per house, as well as a contract with an excavator calling for $100 per house.

It was recited in the contract that an organization called Eagle Rock Estates, Inc., in behalf of Eagle Mount, had theretofore entered into contracts for the sale of eight building plots, each calling for the erection of a one-family dwelling, and it was agreed that the petitioner should endeavor to effect a cancellation of such contracts or a transfer thereof to Eagle Garden, and provision was made for some offset against the $160,000 purchase price of the stock in the event such contracts were not canceled or transferred. It was also recited in the contract that the petitioner would pay the commission due the broker who brought about the transaction between him and the Genchi brothers, in accordance with the agreement in writing between the petitioner and such broker.

On November 18, 1952, the petitioner executed an assignment to Eagle Garden of his 100 shares of stock in Eagle Mount; a certificate for 100 shares of stock was issued by Eagle Mount in the name of Eagle Garden, which was endorsed in blank; Eagle Garden executed a promissory note dated November 18, 1952, made to the order of the petitioner in the amount of $160,000, payable on February 18, 1954, with interest at 4 percent per annum; and Eagle Garden executed a collateral agreement, pledging the 100 shares of stock of Eagle Mount

as security for the payment of the note. Such collateral agreement provided that in the event of certain contingencies such as insolvency of Eagle Garden or failure of Eagle Garden to commence and complete without unnecessary delay construction of homes as contemplated by the contract of November 18, 1952, the petitioner or his assigns might declare the principal to be due and payable, and that upon failure of Eagle Garden to make payments when due, the petitioner or his assigns should have the full power and authority to sell the whole or any part of the collateral security, in which case the petitioner or his assigns should be entitled to purchase any or all of the collateral free from any claim or right of redemption on the part of Eagle Garden. It was specifically provided that the petitioner might transfer the $160,000 note and deliver the collateral security to any assignee.

On November 18, 1952, the petitioner also entered into an agreement with the Genchi brothers, which provided that in the event the Genchi brothers should be called upon to advance funds to Eagle Garden pursuant to the above-described contract of November 18, 1952, he would loan to the Genchi brothers such amount as might be required to meet such obligation up to $10,000, in which event it was agreed that the Genchi brothers would execute their promissory note to the petitioner and would deliver to him all shares of capital stock held by them in Eagle Garden, endorsed in blank as collateral security, and would submit their resignations as officers and directors, such resignations to become effective only in the event of a default in payment. Pursuant thereto, on March 11, 1953, Bernard Genchi and Albert Genchi executed an instrument pledging to the petitioner as security for two promissory notes in the aggregate amount of $10,000 made by them on the same date, their 15 shares of stock of Eagle Garden.

At the time of the sale of the Eagle Mount stock on November 18, 1952, the petitioner and Eagle Mount had not physically done anything to the property and no actual building had been done.

In January 1953, Eagle Garden entered into subcontracts for excavation, sidewalks and curbs, heating and plumbing, I-beams and other steel, dry-wall installations, dampproofing, painting, and paperhanging for approximately 81 one-family houses to be constructed on the land. In February 1953, subcontracts were let by Eagle Garden for hot-water heaters and weather stripping and a contract was made with a sales agent for the project.

It is the practice of the FHA, upon application for mortgage insurance under section 203 of title II of the National Housing Act, to give a conditional commitment after investigation. The commitment is not made absolute until the FHA ascertains that the construction has been in accordance with the approved plans and that the purchasers have adequate credit ratings. On the basis of a conditional commit-

ment from FHA and the credit of the builder, banks customarily give the builder a construction loan.

Eagle Garden made arrangements with a bank for obtaining construction loans. When construction on individual lots had reached a certain stage the bank would make a first advance upon the presentation of releases of the individual lots involved from the $35,500 underlying mortgage, whereupon out of such first advance Eagle Garden would, pursuant to the agreement of November 18, 1952, make payments of $2,500 per lot in curtailment of its obligation of $160,000 to the petitioner, and the petitioner would arrange for transfer of title of the individual lots from Eagle Mount to Eagle Garden.

No payments were made on the $160,000 note in 1952. Between April 10, 1953, and August 24, 1954, Eagle Garden made such payments in the total amount of $160,000 of which $77,500 was paid in 1953, representing 31 lots, and $82,500 was paid in 1954, representing 33 lots. It made payments directly to Gross-Morton Land Corporation for release of lots and took credit therefor in making payments to the petitioner, the total of such credit being $25,695. The payments which were directly made to petitioner by Eagle Garden in 1953 amounted to $66,987.38, which included interest of $1,857.38 and an amount of $3,630 for the purchase of some additional land. The payments which were directly made to petitioner by Eagle Garden in 1954 amounted to $79,735.54, which included interest of $5,130.54 and an amount of $1,800 for the purchase of some additional land.

In its income tax returns for the years 1953 and 1954 Eagle Garden reported, respectively, a net loss of $537.21 and taxable income of $4,301.49.

No income tax returns were filed by Eagle Mount, which was dissolved on August 1, 1957.

In their joint income tax return for the year 1952, which was filed on March 16, 1953, the petitioners reported gross income of $46,510.82. Therein no reference was made to the sale of the Eagle Mount stock and no gain therefrom was reported. In their joint income tax returns for the years 1953 and 1954 they reported, respectively, amounts of $77,500 and $82,500 as amounts received from the sale of the Eagle Mount stock and reported the gain as long-term capital gain on the installment·basis. In computing the amount of gain they used as a basis of the stock $89,588.37 and a selling price of $160,000 and reported expense of sale in the amount of $8,863.07. They thus computed a gain of $61,548.56 of which $77,500/160,000 or $29,812.80 was reported in 1953 and $82,500/160,000 or $31,735.98 was reported in 1954.

The respondent, by deficiency notice mailed on February 12, 1958, determined that petitioner was in receipt of taxable gain in 1952 in the amount of $111,375.98 on the sale of the stock. He computed such gain by using as the adjusted basis of the stock the amount of

$11,140.95, a selling price of $124,500, and selling expenses of $1,983.07. He computed the selling price of $124,500 by determining that the fair market value of the promissory note received from Eagle Garden was $160,000, and subtracting therefrom the payments guaranteed by the petitioner on the Gross-Morton Land Corporation note and mortgage in the amount of $35,500. He further held that the petitioners were not entitled to report the sale of the stock on the installment basis "since you received no initial payment other than the promissory note of the purchasing corporation during the taxable year in which the sale was made." He accordingly determined that the full amount of gain was taxable in the year 1952, and that such gain was taxable at ordinary income tax rates under the provisions of section 117(m) of the Internal Revenue Code of 1939. The notice of deficiency for 1952 was mailed more than 3 years but less than 5 years after the return for 1952 was filed. In the notice of deficiency the respondent held that the deficiency which he had determined for 1952 might properly be assessed under the provisions of section 275(c) of the Internal Revenue Code of 1939.

In the notice of deficiency the respondent also determined deficiencies for the years 1953 and 1954 based principally upon the inclusion in taxable income of those years at ordinary income tax rates under section 117(m) of the respective amounts of $55,017.05 and $56,358.93, representing gain upon the sale of the stock. With respect to the determination for 1953 and 1954 he stated in the notice of deficiency:

In the alternative, it is held that if it is determined you may report the sale of said stock in Eagle Mount Corporation on the installment basis, that your reportable gain of $111,375.98 is taxable to you in the years ended December 31, 1953 and December 31, 1954 to the extent of $55,017.05 and $56,358.93, respectively, at ordinary income tax rates under the provisions of section 117(m) of the Internal Revenue Code of 1939.

The stipulated cost basis of the Eagle Mount stock and the selling price thereof are $13,124.02 and $124,500, respectively.

The respondent also determined additions to tax under section 294(d)(2) of the Internal Revenue Code of 1939 for each of the years 1952, 1953, and 1954 for substantial underestimation of estimated tax. He determined that for 1952 the amount of tax estimated by the petitioners plus the tax withheld was $6,966, whereas the correct tax liability was $86,962.62; that for 1953 the amount of estimated tax and tax withheld was $7,603.14, whereas the correct tax liability was $28,467.43; and that for 1954 the amount of estimated tax and tax withheld was $6,297.06, whereas the correct tax liability was $25,642.88.

Eagle Mount was formed or availed of principally for the construction of property with a view to the realization by petitioner, as its stockholder, of gain attributable to such property through the sale of its stock prior to the realization by it of a substantial part of the

income to be derived from the property. More than 70 percent of the gain realized by the petitioner in each of the years 1953 and 1954 from the sale of his stock of Eagle Mount was attributable to the property so constructed.

## OPINION.

The first question for consideration is whether assessment and collection of the deficiency determined by the respondent for the year 1952 are barred by the statute of limitations. The notice of deficiency was mailed more than 3 years but less than 5 years after the date the return was filed. Accordingly, under section 275 of the Internal Revenue Code of 1939, assessment and collection are barred unless the petitioner omitted from gross income "an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return." As contended by the petitioner, the respondent has the burden of proving that there was such an omission from gross income. *Frank W. Williamson*, 27 T.C. 647, and cases cited therein. The respondent contends that there was such an omission, since he claims the petitioner derived gross income in 1952 from the sale of his Eagle Mount stock in the amount of $111,375.98, which was omitted. The petitioner contends that any gain which he derived from the sale of his stock was not properly includible in income in 1952, but, rather, constituted taxable income in the years 1953 and 1954 upon the installment basis, pursuant to section 44 of the Internal Revenue Code of 1939.[1] The petitioner also claims that in any event no income was derived from the sale of the stock in 1952 since the only thing he received in that year was the promissory note of Eagle Garden and such note was not intended as payment but merely as evidence of the debt. He also claims that the note had no ascertainable fair market value, and that therefore he had not recovered the basis of his stock in 1952, citing *Burnet* v. *Logan*, 283 U.S. 404.

In the notice of deficiency the respondent took the position that the petitioner is not entitled to employ the installment method of report-

---

[1] Section 44 provides:

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALITY [*sic*].—In the case (1) of a casual sale or other casual disposition of personal property * * * for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price * * * the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

ing the income from the sale of his stock since he received no initial payment during 1952, the year in which the sale was made. On brief, however, he makes no mention of such reason despite the fact that the petitioner on brief argued the point. Under the circumstances, we conclude that the respondent has abandoned the contention that the fact that no initial payment was received is a proper ground for denying the petitioner the benefit of the installment basis. We will, therefore, consider only the ground which he does advance on brief, namely, that section 44 requires some timely and affirmative action by a taxpayer electing to take the benefits of that section and that the petitioner did not take such timely and affirmative action in that the sale of his stock was not reflected in any way on the return filed for the year 1952.

It is true that the petitioner did not in his return for the year 1952 specifically evidence such an election—indeed no mention was made in such return of the transaction. However, in that year the petitioner received no money or property other than the promissory note. It is to be observed that section 44 of the Code does not specifically require that a taxpayer make an election in his return for the year of sale in order to have the benefit of the installment basis. It contains no provision whatever with respect to the time or manner of electing to take the benefit of that section. It states that if a casual sale of personal property meets the requirements of the statute, the taxpayer may, under regulations prescribed by the Commissioner with the approval of the Secretary, return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized, or to be realized when payment is completed, bears to the total contract price. Furthermore, in the regulations promulgated pursuant to the specific authorization of the statute, there is no requirement that an election be made in the return for the year in which the sale occurs; they contain no provision as to the time or manner of making an election.[2]

In *John F. Bayley*, 35 T.C. 288, the petitioners sold their residence and in the return for the year of sale disclosed such fact and the details with regard thereto, but claimed to be entitled to nonrecognition of gain under section 1034 of the Internal Revenue Code of 1954. The respondent determined that such gain was recognizable and the petitioners amended their petition before this Court to claim the benefit of the installment basis. We there held that the petitioners had not in their return elected between reporting the gain in its entirety and reporting on the installment basis, that the first time that

---

[2] It was not until the promulgation of section 1.453–8(b)(1) of the Income Tax Regulations under the Internal Revenue Code of 1954 that the regulations required a taxpayer electing to report on the installment method to set forth in his return for the year of sale (or in a statement attached thereto) a computation of the gross profit on the sale under the installment method.

they were faced with the necessity of making an election was when the respondent determined that the gain was taxable, and that their election, in their amended petition, to use the installment basis was timely.

While the *Bayley* case is not precisely in point from a factual standpoint, we think it is governing in principle. Since no part of the selling price was received by the petitioner in the instant case there was no occasion for reporting any amount of taxable income on the installment basis in 1952. In his returns for the years 1953 and 1954, when payments were received, the petitioner reported gain on the sale on the installment basis. Under these circumstances, we think it reasonable to conclude that the petitioner timely elected to report the income from the sale on the installment basis. It is to be noted that in the 1952 return the petitioner had not elected to report the income in a different manner. Cf. *Pacific National Co. v. Welch*, 304 U.S. 191, and *Jacobs v. Commissioner*, (C.A. 9) 224 F. 2d 412, where the taxpayers had elected to return the profit on the completed sale basis and thereafter sought the benefit of the installment sales basis. And it is to be further observed that when, in the return for the year 1953, the petitioner evidenced his election, the tax liability for the year 1952 was still open for whatever adjustment the respondent might deem proper.

The respondent cites the cases of *Sarah Briarly*, 29 B.T.A. 256, *W. T. Thrift, Sr.*, 15 T.C. 366, *John W. Commons*, 20 T.C. 900, and *W. A. Ireland*, 32 T.C. 994, some of which contain language which might indicate a requirement that an election must in all cases be made in the return for the year in which the sale occurred. However none of those cases presented a situation analogous to that herein. In each of those cases the taxpayer in his return for the year of sale had either evidenced an election to report on a completed sale basis, rather than on the installment basis, or, despite the fact that some portion of the sales price had been received in such year, had failed to return any amount of gain and therefore not taken any action evidencing an election to use the installment basis.

In view of the foregoing, we hold that the petitioner is entitled to return the gain from the sale in question on the installment basis; that on such basis none of the gain constituted gross income in 1952; that there was therefore not an omission of gross income in 1952 which would result in a 5-year period of limitations under section 275 (c) ; and that assessment and collection of any deficiency for 1952 are barred.

Although the respondent determined that the full amount of the gain on the sale by petitioner of his stock in Eagle Mount was taxable in 1952, he also determined, alternatively, that such gain was taxable on the installment basis in the years 1953 and 1954. As stated above,

we think the income is properly to be reported on such basis. The parties are now in agreement that the gain derived by the petitioner upon the sale amounted to $111,375.98, of which $55,017.05 was received in 1953 and $56,358.93 was received in 1954. The question is whether these amounts constituted long-term capital gain as claimed by the petitioner or ordinary income under section 117(m) of the Internal Revenue Code of 1939 [3] as determined by the respondent.

We must first dispose of a preliminary controversy between the parties raised on brief. In his brief the respondent alluded to evidence in the record to the effect that when the petitioner transferred to Eagle Mount all his rights in the land purchase agreement with Gross-Morton Land Corporation he sent a letter to Eagle Mount stating that the corporation was to hold the land contract and the land as his agent, make conveyances from time to time as he should direct and hold the proceeds as his agent, and that minutes of a meeting of the stockholders and directors of the corporation were drawn to the same effect. In his reply brief the petitioner construes the statements in the respondent's brief as a request that we find that Eagle Mount was a "dummy" corporation and a mere title-holding agent of the petitioner, and contends that therefore we must disregard the taxable entity and hold that there remains no basis for the application of the collapsible corporation provisions under section 117(m). We disagree with the petitioner. It is clear that it was not respondent's intention to abandon the theory upon which the notice of deficiency was based. Neither party by

---

[3] Section 117(m) provides in material part as follows:

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a)(1)(A), or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

(B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property if—

(i) it engaged in the manufacture, construction, or production of such property to any extent.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; \* \* \*

pleadings has raised the issue of agency, and the stipulation of facts is clearly based upon the assumption that Eagle Mount acted as principal in taking over the land contract, and no mention is made in the stipulation of any agency arrangement.

The petitioner contends that Eagle Mount does not come within the definition of a collapsible corporation, and that the transaction here involved does not come within the ambit of section 117(m) of the Code, because of the fact that the actual construction of the houses was not done by it, but was done by Eagle Garden after the sale by petitioner to Eagle Garden of his stock in Eagle Mount. It is his contention that such preliminary steps as were taken by Eagle Mount did not amount to "construction" within the meaning of the statute and that even if such preliminary steps were considered "construction" there could have been no view to the realization of any gain by the petitioner upon the sale of his stock which would be attributable to such preliminary steps. He states that the only income expected to be realized from the sale of stock has to come, if at all, from the improvement of the land by construction and sale of homes by Eagle Garden. He also claims that since there was no, or at least very little, construction carried on by Eagle Mount, this case comes within the limitation provided in section 117(m)(3)(B) in that more than 70 percent of the gain derived by him upon the sale of his stock is not attributable to property constructed by Eagle Mount. He calls attention to S. Rept. No. 2375, 81st Cong., 2d Sess., p. 89, 1950-2 C.B. 483, 547,[4] to support his argument that section 117(m) contemplates that in the event of a sale of stock the gain intended to be taxed in the manner provided in that section is that portion which would have constituted gain had the corporation distributed the property in question as of the date of sale. He contends that if, at the time of the sale of the stock, he had, instead, received a distribution of the property there would not have been any gain since no actual construction had taken place and hence the value of the property received would not have exceeded the basis of his stock. But whether the petitioner would have had no gain had there been a distribution of the

[4] The language to which the petitioner refers is contained in the following paragraph from the Senate report:

While the primary use made of collapsible corporations in the past has usually involved their liquidation in the manner indicated above, it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation by selling their stock to outside interests at the time and under the circumstances when the corporation might otherwise be liquidated. In like manner, the corporation might distribute the property in question without liquidating and, under section 115(d), the value of the property distributed, to the extent that it was not a dividend, would first be applied against the adjusted basis of the stock to the shareholders and the excess, if any, would be taxable in the same manner as a gain from the sale or exchange of property. Paragraph (1) of the subsection, in prescribing the treatment to be given the gain from the sale or exchange of stock of a collapsible corporation, is deemed to refer to this excess value in the case of a distribution made by the corporation other than in liquidation. * * *

property by Eagle Mount or whether his gain would have been in a lesser amount than the gain which he realized upon the sale of his stock, is not determinative. The committee report to which the petioner refers does not aid him. The language used in such committee report is merely to the effect that section 117(m) is broad enough to cover any gain which might be realized upon a distribution of the property in a transaction not constituting a liquidation but coming within the provisions of section 115(d). See *Jesse Hartman*, 34 T.C. 1085, on appeal (C.A. 2).

Section 117(m)(2)(B)(i) of the Code specifically provides that a corporation shall be deemed to have manufactured or constructed property if it engaged in the manufacture or construction of such property "to any extent." Here Eagle Mount, or the petitioner on its behalf, had done a number of things in anticipation of the carrying out of the construction of the housing project. It had acquired a tract of land, hired an architect, made application at a cost of $3,500 for permits for the erection of 29 single-family houses, made arrangements for the installation of water, sewers, and street improvements, filed a bond therefore at a premium cost of $546, deposited an amount of $6,200 with the village for the purchase of materials for these improvements, paid about $1,300 as advance payment for utility connections, and filed applications with FHA for conditional commitments to insure loans covering the 29 houses to be built, in connection with which applications it had paid fees of about $1,300. It also appears from a recitation in the contract for sale of the stock that Eagle Mount had already entered into contracts for the sale of eight building plots, each calling for the erection of a one-family dwelling.

We have heretofore held that the term "construction" was intended to have its broadest scope and that, for example, the purchase of land, the hiring of a mortgage broker and an architect, and the obtaining of FHA commitments are to be considered as a part of construction. See *J. D. Abbott*, 28 T.C. 795 affd. (C.A. 3) 258 F.2d 537; *Leland D. Payne*, 30 T.C. 1044, affd. (C.A. 5) 268 F.2d 617; and *Ellsworth J. Sterner*, 32 T.C. 1144.

We think there can be no doubt that these various activities of Eagle Mount constituted a part of construction within the meaning of the statute. The petitioner makes a point of the fact that at the time of the sale of his stock the FHA had not yet made any conditional commitments and that hence at that time there was no assurance that the commitments would be made and loans obtained. Nevertheless, the filing of the applications was a necessary preliminary step, together with other steps taken, in carrying out the construction plans. Accordingly, under the statute, Eagle Mount must be deemed to have constructed property.

In *Mintz* v. *Commissioner*, (C.A. 2) 284 F. 2d 554, affirming 32 T.C. 723, it was stated:

The statute was enacted to stop taxpayers' alchemy by which they sought to convert ordinary income into capital gains by means of using corporations formed for this purpose. Both the House and Senate Committee reports described a collapsible corporation as "a device whereby one or more individuals attempt to convert profits from their participation in a project from income taxable at ordinary rates to long-term ·capital gain taxable only at a rate of 25 percent." H.R. Rep. No. 2319, 81st Cong. 2d Sess. 96; Sen. Rep. No. 2375, 81st Cong. 2d Sess. 88.

\* \* \* If taxpayers' hopes of receiving capital gain treatment through the stock sale vehicle were realized, income that normally would be taxed at ordinary income rates, once to the corporation and again upon distribution to the stockholders, would be taxed at the lower capital gains rate.

In *Burge* v. *Commissioner*, (C.A. 4) 253 F. 2d 765, affirming 28 T.C. 246, it is stated:

The word "collapsible" considered apart from its context would be somewhat misleading; but there can be no question, we think, as to what Congress meant by a "collapsible corporation" as used in the statute. That term was used to describe a corporation which is made use of to give the appearance of a long term investment to what is in reality a mere venture or project in manufacture, production or construction of property, with the view of making the gains from the venture or project taxable, not as ordinary income, as they should be taxed, but as long term capital gains. Because the basic type of transaction which gave rise to the legislation involved the use of temporary corporations which were dissolved and their proceeds distributed after tax avoidance had been accomplished, the term "collapsible corporation" was employed to describe the corporations used for this form of tax avoidance; but the statute was drawn in broad general terms to reach the abuse which had arisen, whatever form it might take.

See also *Spangler* v. *Commissioner*, (C.A. 4) 278 F. 2d 665, affirming 32 T.C. 782; and *Jesse Hartman, supra*.

Here the petitioner entered into the contract for the purchase of the tract of land in question with a view to construction and sale of single-dwelling houses. He then caused Eagle Mount, his wholly owned corporation, to take title to the land and take the· preliminary steps in such construction. Thereafter Eagle Garden was incorporated, petitioner owning one-half of the stock and the Genchi brothers owning the remainder, and he sold his stock in Eagle Mount to Eagle Garden under a contract which required Eagle Garden to carry out the remaining stages of construction and pay him a total of $160,000. The contract contemplated that Eagle Mount would retain title to the land until individual lots were ready for construction, at which time such individual lots would be released upon the payment by Eagle Garden to the petitioner of an amount of $2,500 per lot, such payments to apply against the stated purchase price of the stock, $160,000. As the advance construction loan was received with respect to each

lot Eagle Garden paid therefrom $2,500 to the petitioner, the lot was released from the underlying mortgage and transferred to Eagle Garden, and payment was credited against the purchase price of the stock. Payment of the entire amount of $160,000 was completed on August 24, 1954, upon the release of the 64th lot. The contract of sale of the stock provided that Eagle Garden should not declare any dividends until the entire $160,000 was paid. The other stockholders, the Genchi brothers, were thus precluded from receiving any dividends up to that time. It was provided, however, that they should receive a fixed fee for the construction of each house. Eagle Mount filed no tax returns and paid no tax. Eagle Garden filed returns for 1953 and 1954 showing a net loss for 1953 and taxable income of about $4,300 for 1954.

We think that the facts set forth above demonstrate clearly that Eagle Mount was used to give the appearance of a long-term investment to what was in reality a venture in construction of houses with the view of making the gains from the venture taxable as long-term capital gains, rather than ordinary income. Under such circumstances, Eagle Mount comes within that class of corporations which Congress intended to consider "collapsible."

Furthermore, we think Eagle Mount comes within the literal terms of the definition of a collapsible corporation contained in the statute. It was availed of [5] for construction, as hereinabove pointed out. There was also the requisite view to a sale of Eagle Mount's stock by petitioner prior to the realization by the corporation of a substantial part of the net income to be derived from the property, and to the realization by the petitioner of gain attributable to property constructed by Eagle Mount. The value of the Eagle Mount stock certainly had been enhanced by the preliminary steps of construction taken by it. The purchase price of such stock fixed between the petitioner and Eagle Garden (in which the Genchi brothers held a one-half interest) must be considered as reflecting the value of the project, which value was attributable to the preliminary construction activities carried on by Eagle Mount. There is no evidence to show that such value is attributable to anything else. Accordingly, the gain realized upon the sale of the stock is to be considered as attributable to the construction carried on by Eagle Mount. See *Ellsworth J. Sterner, supra.*

In view of our conclusion that Eagle Mount was a collapsible corporation, the gain realized by the petitioner upon the sale of his stock in each of the years 1953 and 1954 is to be considered as gain

---

[5] As stated in section 39.117(m)–1(b)(4) of Regulations 118, "A corporation is formed or availed of with a view to the action described in section 117(m)(2)(A) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section." See *Ellsworth J. Sterner,* 32 T.C. 1144.

from the sale or exchange of property which is not a capital asset, unless the limitations of section 117(m)(3) apply. See *Glickman* v. *Commissioner*, (C.A. 2) 256 F. 2d 108, affirming a Memorandum Opinion of this Court.

As stated, the petitioner relies upon the limitation contained in section 117(m)(3)(B) of the Code. That section provides that in the case of gain realized by a shareholder upon his stock in a collapsible corporation, subsection 117(m) shall not apply unless more than 70 per centum of such gain is attributable to the property manufactured, constructed, or produced. The Senate Finance Committee report [6] states that this provision was "designed to insure that the application of the subsection will be limited to those corporations where the relationship between the gain realized [in the instant case upon the sale of stock] and the property manufactured, constructed, or produced is substantial." This means that section 117(m) shall not apply unless more than 70 per centum of the gain is attributable to construction or manufacture, as distinguished from some other cause such as ordinary or normal appreciation in the value of the property. Here the gain was attributable entirely to construction. The petitioner's argument that this limitation applies, on the ground that more than 70 per centum of the gain was attributable to construction actually done by Eagle Garden and not by Eagle Mount, is rejected for the reasons set forth hereinabove.

The amounts of additions to tax under section 294(d)(2) of the Code for the taxable years 1953 and 1954 will be computed in the light of the correct tax liability for those years as determined in the recomputation under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

DRENNEN, *J.*, dissenting: I respectfully dissent on the collapsible corporation issue. Respondent has chosen to attack Eagle Mount as a collapsible corporation. The majority opinion treats Eagle Mount and Eagle Garden as two unrelated corporations with no agency existing between them. Thus, in order to find that Eagle Mount qualified as a collapsible corporation, we must look only to petitioner's activities with respect to Eagle Mount and Eagle Mount's activities with respect to the property. So limited, to find Eagle Mount qualified as a collapsible corporation, in my opinion, requires stretching the language of section 117(m) beyond reasonable limits.

The statute read as a whole and applied here would require that Eagle Mount was formed or availed of principally for the construction

[6] S. Rept. No. 2375, 81st Cong., 2d Sess., p. 90, 1950-2 C.B. 483, 548.

of property with a view to the sale of its stock by petitioner prior to the realization *"by the corporation"* (Eagle Mount) of a substantial part of the net income to be derived from the property, that petitioner did realize a gain attributable to the property constructed, and that more than 70 per centum of such gain was attributable to the property so constructed.

There is nothing to indicate that petitioner had the proscribed view at the time Eagle Mount was formed. It is apparent that at the time Eagle Mount was "availed of" by petitioner, presumably when he sold his stock, there was no prospect that Eagle Mount would realize any more income from construction of the property. So Eagle Mount could not have been availed of with a view to sale of its stock prior to realization by it of a substantial part of the net income from its activities with respect to the property. And it also seems clear that 70 percent of the gain realized by petitioner was not attributable to the property constructed by Eagle Mount. It seems to me that petitioner's gain must have been attributable either to increment in value of the property or, as seems more likely, to construction to be performed by Eagle Garden in the future.

To find that Eagle Mount was a collapsible corporation, I believe we would have to interpret the statute to mean that any corporation is a collapsible corporation which is formed to construct property and whose stock is sold at a gain prior to the time a substantial part of the net income from the property is realized, regardless of who performs the construction which gives rise to the gain, who realizes the gain, and whether the gain is attributable to construction activities of the corporation whose stock is sold. I do not think such would be a permissible interpretation or construction of the statute.

I think the effort of the majority opinion to attribute the increase in value of petitioner's stock in Eagle Mount to the preliminary construction activities carried on by Eagle Mount reaches an unreasonable conclusion but that the effort itself supports my views expressed above. While petitioner may have converted what would ordinarily be ordinary income to capital gain, I do not think his efforts should be successfully attacked in this manner.