MORRIS COHEN, ET AL.,[1] PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 87709, 88251–88264. Filed March 15, 1963.

*Abe L. Hoffman, Esq.*, and *Gilbert Goldstein, Esq.*, for the petitioners.

*William J. McNamara, Esq.*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated. Paul Goldstein and Zelda Goldstein, Docket No. 88251; Sam Goldstein and Tillie Goldstein, Docket No. 88252; Abe H. Goldstein and Yetta Goldstein, Docket No. 88253; William J. Goldstein and Elizabeth Goldstein, Docket No. 88254; David Goldstein and Sylvia Goldstein, Docket No. 88255; Stanley L. Cohen, Docket No. 88256; Lewis Sachter and Charlene Sachter, Docket No. 88257; Arnold Cook and Julie Cook, Docket No. 88258; Abe L. Hoffman and Florence Hoffman, Docket No. 88259; J. Glenn Donaldson and Frances E. Donaldson, Docket No. 88260; Louis Cook, Docket No. 88261; Gilbert Goldstein and Miriam Goldstein, Docket No. 88262; Edward W. Linkow and Esther Linkow, Docket No. 88263; and Harold Cook and Leanor Cook, Docket No. 88264.

**OPINION.**

Murdock, *Judge:* The Commissioner held and contends that both the Sarkisian property and the DOM properties were held primarily for sale to customers in the ordinary course of business of the holders. The evidence shows that there was no such business ever carried on either by Sarkisian or DOM (while its stock was owned by the petitioners) and that the petitioners never intended to subdivide the properties and sell them as lots or as improved properties. The petitioners anticipated that the properties would eventually be attractive for subdivision by possible purchasers, but the petitioners did not intend to change them into lots or to go into any business of selling the properties. The intention of the petitioners was to hold the properties as they were when purchased, until they could be sold in their entireties, hopefully, at a profit.

The Commissioner points to evidence which he says shows that the petitioners intended to subdivide the properties. This evidence re-

lates to some efforts made to have the property rezoned from "agriculture" and to assure the availability of water and sewer services when subdivision of the land would eventually take place. Representations were made to the local water, sewer, and zoning authorities that the properties here involved would eventually be subdivided into lots and then would need water and sewer facilities. Some of these efforts were made by prior owners, some by the petitioners during their ownership, and some by subsequent owners. The water and sewer authorities were apparently interested in knowing what the future needs of the lands in their districts would be so that adequate plans could be made. The landowners were likewise interested in those plans and cooperated from time to time. Representatives of the petitioners spent a small amount of their time in such activities to protect their interests, as any landowner would and as other owners of land in the same area were doing. Whatever one accomplished affected the others as well. The petitioners took no such steps as were found in *Jack Farber*, 36 T.C. 1142, and cases cited therein, on which the Commissioner relies. There is evidence here that the early sale at a profit of the DOM stock was made possible by the selection of nearby land for the location of two large manufacturing plants, a fortunate circumstance not anticipated by the petitioners.

The very limited activities of representatives of Sarkisian or of DOM while the petitioners owned its stock did not put either in the real estate business, did not result in any physical change or improvement to the property of either and, in the case of DOM, did not constitute "construction" even within the broad meaning of that term as used in section 341(b). DOM was not a collapsible corporation while the petitioners held its stock.

Some of the petitioners indicated on their returns for each taxable year that they elected to report long-term capital gains from the sale of the DOM stock on the installment method, although they stated they had not received any income from that sale during that tax year. The Commissioner agrees that all gains from the DOM stock sale may be reported under the installment method but he disagrees on the tax treatment of two items. First, he contends that amounts, which the petitioners regard as loans, were in fact contributions of capital. Second, the Commissioner contends that $74,220.26, paid by the buyer for a sewer connection, which under the contract the sellers were to provide at their own expense, was not a reduction of the purchase price but was a 1957 payment which included some installment income.

It makes no difference taxwise whether the advances were loans [4] or capital contributions originally. If they were capital contributions

---

[4] The Commissioner admitted in every one of his numerous answers in these cases that the advances were loans as alleged in the petitions.

they were a part of the basis of the stock of the contributor recovered through the sale and as such returned a part of his profit in the tax years under the installment method. If they were loans originally, as they pretty clearly were, the lenders and the other stockholders changed them into capital contributions by their agreement (to which the purchaser was not a party) whereby the lenders canceled their debts due from DOM and, to avoid any loss to them, were allowed by the other stockholders to receive an equivalent amount from the first cash payments of the purchase price of the stock. This arrangement increased for each lender the basis for gain on his stock by the amount of the loan he canceled and each payment from the purchaser received by him was in part a return of his basis and in part receipt of a part of his profit under the installment method which he elected to use. The stockholders other than the three lenders received no part of the purchase price and no profit until the buyer's payments exceeded the former loans.

The parties to the sale of the DOM stock stated in their contract that the purchase price would be $1,282,344, but one of the conditions was that the sellers would bring a sewer main to the property at their own expense. Later, the same parties agreed that the purchaser would bring the sewer line to the property and it is here stipulated that "The approximately $74,220.26 cost of said sewer lines was deducted from the amounts which South Range Development Company owed for the DOM, Inc., stock." A copy of an October 1, 1957, "settlement sheet," made a part of the stipulation, shows that the $74,220.26 was credited, with other items, to the purchaser against "due under contract $98,028.80" and other lesser items to which the sellers were entitled.

The petitioners argue from the above that the purchase price was reduced $74,220.26 by the above-described circumstances, while the Commissioner contends that the $74,220.26 represents a constructive payment by the purchaser of a part of the agreed purchase price in 1957 and represents in part taxable income in that year under the installment method of reporting the income from the sale. It seems obvious that the buyer would have insisted upon a corresponding reduction in the purchase price of the stock if the agreement had not required the sellers to pay for the connecting sewer main. The best solution of this problem would seem to be that the later agreement between the parties, shifting the sewer construction to the buyer, was a modification of the original contract under which the purchase price was reduced as the petitioners contend. It follows that the $74,220.26 should not be included in the sellers' bases and was not a constructive payment of purchase price in 1957.

The Hoffmans claim a nonbusiness bad debt on the loan to Wick. It is reasonably clear that no gift was intended and that Hoffman

had no practical way in 1956 of requiring payment of any of the $960.40 due from Wick, then a minor in the Air Force, and his whereabouts unknown to Hoffman. Hoffman, a lawyer, testified that further efforts or expense on his part were not justified. The amount is deductible as a nonbusiness bad debt.

*Decisions will be entered under Rule 50.*